Troy L. Isaacson, Esq., NV Bar No. 6690
6671 S. Las Vegas Blvd.
Building D, Suite 210
Las Vegas, Nevada 89119
Telephone: (702) 529-5229/Facsimile: (702) 529-5228

Ryan L. Isenberg
Georgia Bar No. 384899
Isenberg & Hewitt, P.C.
600 Embassy Row, Suite 150
Atlanta, Georgia 30328
770-351-4400 (Voice)/770-828-0100 (Fax)
ryan@ihlaw.us

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT MILLER | CIVIL ACTION FILE |
|     PLAINTIFF, | NO. 2:18-cv-02097-JAD-VCF |
| V. | MOTION FOR SUMMARY JUDGMENT |
| | ORAL ARGUMENT REQUESTED |
| 4INTERNET, LLC<br>JOHN DOES 1-10 | |
|     DEFENDANTS. | |

COMES NOW, 4INTERNET, LLC, and herein moves for summary judgment in the above-styled matter.  In support of this Motion, Defendant relies upon its brief, the depositions of Michael Levy, Robert Miller, Eugene Sadowski, and Christopher Sadowski; authenticated records from Google and the New York Post; a declaration of Michael Levy; verified interrogatory responses; all other pleadings of record and evidence presented at argument.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Plaintiff, his lawyer, and his "manager" are copyright trolls that churn out hundreds of cases and who knows how many thousands of demands delivered to the operators of websites

without regard to whether there is actionable infringement and absent any consideration of fair use or any other defense.  Plaintiff is employed full-time to take pictures and submit them to the New York Post ("NYP").  Plaintiff is one of a number of such individuals who are all represented by either or both of Plaintiff's counsel and now disbarred lawyer Richard Liebowitz. Christopher Sadowski ("Chris"), another NYP freelance photographer, is Plaintiff's "manager." Chris gets ten percent of the recovery, but splits it with his uncle, Eugene Sadowski ("Eugene"), who works full-time scouring the internet for potential claims of infringement.

Plaintiff almost exclusively photographs factual events that have already occurred.  He is not involved in the staging or arrangement of the scene and provides no direction.  Plaintiff also doesn't actually license the pictures he takes.  The entire business venture of the trolling organization is based on the fact that the NYP publishes images on its website and distributes them in various ways, including as relevant here, a process called RSS as well as most forms of social media.  The "news" articles and the accompanying images are indexed by search engines, and whenever that image shows up on any other site it's party time.  Defendant operates a search engine that indexed the article and image.

For purposes of this motion, Eugene found it and started the process in motion that got us to where we are today.  Plaintiff's claims fail for several reasons.  First, there is no evidence anyone ever actually saw the image other than Plaintiff's organization, Defendant and its counsel, and as a result there is no case or controversy under Article III.  Second, there was no display under the "server test" because the image file at issue only ever resided on the NYP server. Third, when a search engine indexes and categorizes publicly distributed content, if a user searches for and finds content, that is fair use.  Fourth, Defendant is entitled to immunity under the DMCA.  Fifth, Plaintiff granted an express license to the NYP.  By including the image in

2

the RSS feed for the purpose of having the article indexed, the NYP granted a sublicense to Defendant to index the image and article and a result, Plaintiff's claims are barred by license.

And, finally, Plaintiff's goat picture is not entitled to copyright protection for two reasons that are somewhat intertwined.  Article I, Section 8, Clause 8, of the United States Constitution granted Congress the enumerated power "To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."  For reasons discussed below, as applied to photographs, 17 U.S.C. §§ 102 and 410 are unconstitutional to the extent they create and provide a presumption that every photograph is entitled to copyright protection.  This must no longer be the law.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ("SOMF")

**Facts About the Plaintiff**

1.      Robert Miller ("Miller") is an independent contractor for the NYP.  He works about five days a week as a freelance photographer.  Under the contract, Miller grants the NYP an exclusive license which itself grants permission to use the photo however it wants and to grant sublicenses.  Miller Depo. Ex. 1 (NYP_000005); 36:9-37:9.

2.      Miller knew Christopher Sadowski ("Chris") from the NYP.  Around 2017, Chris introduced Miller to attorney Mathew Higbee.  Miller Depo. 44:13-46:5.

3.      Chris allegedly helps Miller keep track of his intellectual property, but Miller rarely communicates with him.  And, Chris rarely does actually anything but does receive what is really a ten percent referral fee from Higbee & Associates on behalf of Miller.  Miller Depo. Ex. 11 (ROG 1); 59:25-60:9; Chris Depo. 16:15-25; 28:10-12.

3

4.      Chris' uncle Eugene Sadowski ("Eugene") works seven days a week looking for infringements for maybe ten or so photographers and gets half of what Chris receives from claims collections.  Eugene Depo. 13:8-10; 17:17-18:7.

5.      Miller's copyright filings are either done by Chris or by Richard Liebowitz.   When Liebowitz files the applications he downloads the photos from the NYP URL and that is the image that is copyrighted.  Miller Depo. 82:14-25.

6.      It is not known if any changes are made to the images from the photo that Miller takes as compared to what the NYP posts online.  Miller Depo. 71:4-7; Chris Depo. 42:11-43:1.

7.      Miller does not know what was submitted as the deposit copy for the goat picture.  Miller Depo. 80:25-81:3.

8.      Miller received an e-mail notice after 11:42 A.M. from the NYP and may have received a call and drove an hour to an hour and a half to take pictures.  Miller Depo. 61:8-63:2.

9.      Miller did not stage the goat picture and generally doesn't stage pictures at all. Miller Depo. 72:25-73:3. 121:5-8.

10.     For pictures taken by Plaintiff outside, anybody standing next to Plaintiff could have taken the same picture.  Miller Depo. 14:4-9.

11.     There is no evidence that Plaintiff was ever actually paid for a license to use a photo outside the context of a claim for infringement or a lawsuit.  Miller Depo. 98photo:21-100:13.

**Facts About the Image**

12.     Photographs contain metadata referred to as EXIF data. This data provides information about the camera settings.  Levy Decl. ¶¶ 14-15; Depo. Ex. 22 (pp.16-19).

13.     The goat image that was published in the NYP was taken using Program AE, or in other words, the camera selected the exposure, focus, shutter timing, ISO speed, and more. Id.

4

14.     No one other than Plaintiff, his "legal team," Defendant and its lawyer ever saw the goat image. Levy Declaration ¶ 13; Depo. Ex. 11; 16; 181:8-182:3.

**Facts about How Defendant's Search Engine Indexes and The Pages at Issue**

15.     The 4Search system would have indexed the article and image page per the NYP RSS instructions around August 9. Levy Depo. 138:21-139:3.

16.     The 4Search search engine extracts the keywords from the pages that its web crawler visits and uses those keywords to categorize the pages to provide better and more relevant search results. Levy Decl. ¶ 17.

17.     The alleged infringing pages did not exist until Eugene did his search, clicked on the result, and then the 4Search system generated the page.  Levy Depo. 125:1-12; 138:21-139:3.

18.     The image displayed in Levy Depo. Ex. 4 is in-line linked and the page only rendered whatever was at the source URL subject to the user's device and browser settings. Levy Depo. 61:9-62:2.

19.     The page that was rendered that included the image of the goat at issue resided on the NYP server.  Levy Depo. Ex. 13.

20.     Users searching for news would see results from the 4Search index and users searching the broader web were effectively using Microsoft Bing through the 4Search site. Levy Depo. 50:3-16.

**Facts About Defendant**

21.     Michael Levy ("Levy") is the inventor of a search engine process referred to as "dynamic search set creation."  Levy assigned the invention and patent (Patent No. 14,624,609) to Ubunifu. Levy Depo. 164:3-165:2.

22.     Levy is the founder of 4Internet, LLC. Levy Depo. 34:4-9.

5

23.     4Internet operates a search engine using the dynamic search set creation patent.  Levy Depo. 35:24-36:9.

24.     The 4Internet search engine operates through a network of over one thousand domains that all begin with the number 4, which is referred to as the 4Search network.  Levy Depo. 36:15-37:20.  As relevant to this case, among the 4Search network domains are 4Jewish.com and 4Rightwing.com.

25.     4Internet does not generate revenue and is not engaged in commercial activity.  Levy Depo. 43:15-46:15.

26.     Defendant does not have subscribers or account holders.  Levy Decl. ¶ 18.

**Facts About Photo Proliferation**

27.     Miller began using a digital camera in 2002 or 2003.  Miller Depo. 27:17-28:6.

28.     In 2015, Google launched Google Photos to allow people to store pictures.  As of November 11, 2020, there were more than 4 trillion images stored in Google Photos with 28 billion new photos and videos being uploaded every week.  See Exhibit D.

29.     As of 2012, Facebook announced that than 300 million photos per day were being uploaded to its service.  In 2017, Snapchat announced that over 2.5 billion "Snaps" were being created each day.  Levy Depo. Ex. 22; Decl. ¶ 15.

**DMCA Related Facts**

30.     The search engine process (meaning the crawling of the internet and indexing and storage of metadata) is an automated technical process.  It made no changes to any of the data that was indexed.  Def. Resp. to Int. 25.

31.     The image at issue, was made available by, and always only resided on the server for the NYP York Post and was only transmitted at the request of Eugene Sadowski. Id.

6

32.     4Internet did not select any recipient of any material, but served up information and to the extent the image was displayed, the image was displayed at the request of the user. Id.

33.     4Internet does not copy or store images.  Any image that was rendered as a result of a user search is only stored in the system cache for a period of time that would not exceed 48 hours and likely less. Id.

34.     There were no conditions or technologies relating to the availability or return of the image.  The NYP website makes its content available to search engines to index through an RSS feed.  The 4Internet system automatically indexed the NYP website and stored the metadata that would allow a user doing a search to render the image at issue upon request.  Id.

**Other Facts**

35.     4Internet had zero revenue in 2018, did not sell advertising, and that the purpose of the company is to try to build a better search index and better technology for the better good or at least to have made a meaningful contribution during his life. Levy Depo. 26:11-22; 43:15-46:15.

36.     Eugene located the goat picture at www.nuttynewstoday.com before he claims to have found it at Defendant's site, which would mean that the image that was rendered for him was in his cache.  Eugene Depo. 27:7-29:12; Ex. 2; Levy Depo. 57:7-58:21.

37.     Defendant disabled the link and access to the alleged infringing image on September 24, 2018. Levy Depo. 222:25-223:13; Levy Declaration ¶ 7.

 **III.  Argument and Citation to Authority**

A.  Summary Judgment Standard

Summary judgment should be granted when there are no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law. F.R.C.P. § 56(a). Defendant bears the burden of this demonstration, but once made the Plaintiff must come

forward with evidence showing a genuine issue of fact is in dispute. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusions and unsupported facts are not sufficient, and an absence of evidence can support Defendant's motion. *Fletcher v. Huang*, 164 F.3d 630 (9th Cir. 1998) (citing *Celotex*, supra).

B.  Plaintiff Does Not Have a Valid Copyright

i. Elements of a Copyright Claim for a Photograph

In order to establish copyright infringement, Plaintiff "must prove both valid ownership of the copyright and infringement of that copyright by the defendant[]." *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000) (internal quotation mark omitted). Defendant does not dispute that a copyright registration was issued for a goat related image. But, Plaintiff cannot establish what image was actually copyrighted. The application was filed by oft sanctioned and now suspended lawyer Richard Liebowitz. See *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020). Miller doesn't know what image was copyrighted, nor what changes were made to the image itself before it was published, and Liebowitz would copyright whatever the NYP published. Despite having specifically so requested, Plaintiff has failed to produce an electronic version of the deposit copy for consideration or analysis. Because Plaintiff cannot demonstrate which photograph was actually registered, he cannot prevail on his copyright claim.

ii.  The Image is Not Entitled to Copyright Protection

The primary objective of copyright is not to reward the labor of authors, but "[t]o promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). To be entitled to copyright protection, the work must

8

possesses at least some minimal degree of creativity. *Ets-Hokin* at 1076; *Feist*, supra.  A minimal degree of creativity is a constitutional requirement.  *Feist* at 362.  In *Ets-Hokin*, itself decided more than twenty years ago, the Ninth Circuit reviewed the history of copyright protection afforded to photographs.  That Court reiterated the century old belief that "no photograph, however simple, can be unaffected by the personal influence of the author."  Though this was undoubtedly true when photography required skill, Judge Hand could not have foreseen a time when elementary school age children would have access to handheld devices each of which can take and store thousands of pictures. The *Ets-Hokin Court* continued to assert that "creative decisions involved in producing a photograph may render it sufficiently original to be copyrightable and have carefully delineated selection of subject, posture, background, lighting, and perhaps even perspective alone as protectable elements of a photographer's work." *Id*. a 1077 (citing *Los Angeles News Serv. v. Tullo*, 973 F.2d 791, 794 (9th Cir.1992) (quoting *United States v. Hamilton*, 583 F.2d 448, 452 (9th Cir.1978)).

Here, Plaintiff was asked to drive to New Jersey by the NYP in response to a request he received late morning on August 9.  Mr. Miller does not seem to speak goat, and did not ask the goat to pose, or tell the goat what time to break free or be available, nor could he tell the goat to pose.  He did not choose the time of the escape or request, which means he got there when he got there and did not choose the lighting.  The goat was still outside so Plaintiff didn't choose the background.  There is simply nothing that Plaintiff actually did that would satisfy even the minimal amount of requisite creativity.  For minimal creativity to have any meaning, the act of

pressing a button on a digital camera is insufficient.  Because five-year-old kids[1] and animals[2] can show up and record images that would otherwise be entitled to copyright, something tangible must be required to satisfy the element of minimal creativity.  Post hoc claims about the "choices" the photographer made will not do as every photographer in the picture below would be able to make false claims about the angle or lighting when the clear reality is that they were all crammed in together and got whatever shot they could.



What the Plaintiff does is use a digital device to record facts without any creative decision making.  Allowing Plaintiff to have a copyright for taking a picture of a goat where he was not involved in staging the image at all is like giving a copyright to the homeowner of a video doorbell system that records a deer[3] or a police officer who turns on his dashboard camera.  There are no creative choices being made – just the ability to record what everyone else can see.  Without any objectively verifiable contribution by the photographer modern digital cameras record facts.  Period.  And, facts are not subject to copyright. *Feist* at 344-345.  If anyone can do it, and Plaintiff admitted that is the case [Miller Depo. 140:4-9], it does not promote the useful arts to grant copyright protection.

C.  The Plaintiff Lacks Standing under Article III

---

[1] https://clickitupanotch.com/photography-for-kids/
[2] https://time.com/5352744/dog-steals-gopro/
[3] https://www.upi.com/Odd_News/2021/02/24/albino-deer-doorbell-camera-Eatontown/8801614204548/

10

Article III standing requires a Plaintiff to establish that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (citations omitted). Injury in fact is itself comprised of two elements which require the injury be concrete and particularized. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In *Spokeo*, the Supreme Court determined that a bare statutory violation itself of a claim asserted under the Fair Credit Reporting Act was insufficient to demonstrate a concrete injury under Article III. Spokeo at 341. This is because the violation itself may not result in any actual harm. *Id*. at 342.

Though Defendant takes umbrage with the Ninth Circuit's apparent conclusion that a website can be found to have displayed a photograph even if no one ever actually saw it (*Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065 (9th Cir. 2021)), the undisputed evidence in this case is that no one saw the goat picture other than the parties and their lawyers [SOMF ¶ 14 ]. In the absence of any evidence that any member of the public ever saw the alleged infringing image, Plaintiff has only made the same bare statutory violation allegation that was asserted by the plaintiff in *Spokeo*. Because Plaintiff cannot demonstrate any concrete injury, he lacks standing and under F.R.C.P. §§ 12(b)(1) and (h)(3), and the Court must dismiss his complaint.

D.  Defendant Did Not Display the Image

*i.  The Server Test*

Plaintiff's claim is that image at issue was displayed on two URLs associated with Defendant's site. In *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007) the Ninth Circuit adopted what is now referred to as the "server test." Under the server test, "a computer owner that stores an image as electronic information and serves that electronic information

directly to the user ('i.e., physically sending ones and zeroes over the [I]nternet to the user's browser') is displaying the electronic information in violation of a copyright holder's exclusive display right. *Bell,* supra at 1073. However, "if a website publisher does not "store" an image or video in the relevant sense, the website publisher does not "communicate a copy" of the image or video and thus does not violate the copyright owner's exclusive display right. *Hunley v. Instagram, LLC*, No. 21-CV-03778-CRB, 2021 WL 4243385, at *1 (N.D. Cal. Sept. 17, 2021) (citing *Perfect 10* at 1160-1161).

Defendant did not store any images. For simplicity's sake, Defendant's system downloaded metadata from the NYP RSS feed. Defendant's search engine only stores the data, and when a user would click on a search result it would generate the page. When Eugene did a reverse Google image search on August 31, 2021, he would have seen the image and clicked the link and then seen the page as it appears in Levy Depo. Ex. 4, subject to his browser settings. As the Court can see from Levy Depo. Ex. 13[4] the page linked to the image source at the NYP. This is further evidenced by the address seen at the bottom of Eugene Depo. Ex. 7 (pages 3-4). [Eugene Depo. 40:14-41:14]. It is therefore undisputed that applying the server test, Defendant did not display or communicate a copy of the goat picture.

ii. In-Line Linking

---

[4] See lines 678, 707, 711, 713, 714, 1139, and 1143 – all of which point to the NYP. (https://nypost.com/wp-content/uploads/sites/2/2018/08/fred-the-goat-breakout.jpg?quality=90&#038;strip=all&#038;w )These are all still live links that will open the picture of the goat in your browser from the NYP .

In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1161 (9th Cir. 2007) the Plaintiff sued Google for direct copyright infringement. Perfect 10 sold access to images of nude models by subscription, but those images found there way onto other websites without authorization or permission. These other websites were indexed by Google's search engine. Perfect 10 sued Google and Amazon and the cases were consolidated. Among the claims were that Google made thumbnails[5] of the images and that when the thumbnail or result was "clicked" on by the user, the original, full-size image would appear. Ultimately, the Ninth Circuit found that the display of thumbnails violated the Plaintiff's display rights, but constituted fair use. As it relates to the in-line linking claim, the *Perfect 10 Court* explained

> Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen

In a later case in which Perfect 10 sued a Russian search engine that was accessible in the United States, the District Court, applying *Perfect 10*, agreed that "in-line linking to a full-size image does not constitute direct infringement." *Perfect 10, Inc. v. Yandex N.V.*, 962 F. Supp. 2d 1146, 1155 (N.D. Cal. 2013), as amended (Sept. 6, 2013). The images that are seen in Levy Depo. Ex. 4 for which the location can be found in Levy Depo. Ex. 13 are framed in-line linked images.

Q. Okay. And so non-thumbnail images like the one we were looking at in Exhibit 4 of the goat photo, those are just inline linked directly from the source?

---

[5] A thumbnail is generally a smaller, cropped, and compressed or reduced pixel version of the original image.

1        A.  Right.  So that's likely -- you're talking about the way it was then or now?

2        Q.  Let's talk about August of 2018.

        A.  That was just inline source.

Levy Depo. 168:14-21.

In *Perfect 10 v. Amazon* there was some confusion as to the source of the image from the user's viewpoint, but this issue isn't relevant to the issue of display or communication of the image.

> Perfect 10 argues that Google displays a copy of the full-size images by framing the full-size images, which gives the impression that Google is showing the image within a single Google webpage. While in-line linking and framing may cause some computer users to believe they are viewing a single Google webpage, the Copyright Act, unlike the Trademark Act, does not protect a copyright holder against acts that cause consumer confusion.

*Perfect 10, Inc. v. Amazon.com, Inc.*, supra at 1161.

Applying *Perfect 10*, regardless of whether Levy Depo. Ex. 4 caused any confusion about the source of the photo; Plaintiff's claim fails because it is undisputed that the images are in-line linked and framed.

### iii.  The Image Was in Eugene's Cache

The Plaintiff cannot demonstrate that the image that was displayed was ever on any computer belonging to Defendant. When a computer user goes to a site and the browser renders the page, unless certain actions are taken to prevent this, or the cache is cleared, the computer will store certain data including images.  Eugene has previously located the goat picture from another website, www.nuttynewstoday.com [SOMF § 36].   Unfortunately, Eugene can't remember exactly when or what he saw and the evidence that would have demonstrated this was

spoliated[6] [Eugene Depo. 11:23-12:14; 35:25-36:6; Chris Depo. 77:18-78:4].  Because the image was cached in Eugene's computer, when he accessed Defendant's site, the image he saw may well have resided on his own computer and it was never actually viewed from Defendant's site. Because Plaintiff cannot actually demonstrate that the evidence it claims that supports the alleged infringement originated from the Defendant at all, the Court should grant summary judgment.

**E.  Fair Use**

Fair use is a defense to what would otherwise constitute infringing conduct.  Though originally an equitable rule of reason, fair use has been codified at 17 U.S.C. § 107.  The statute informs the Court to consider the following factors (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. However, "the provision's list of factors is not exhaustive, [] the examples it sets forth do not exclude other examples, [and] [] some factors may prove more important in some contexts than in others."  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021) (parentheticals omitted).  Moreover, the fair use doctrine "requires judicial balancing, depending upon relevant circumstances, including "significant changes in technology."  *Id*. at 1197.

As the *Google Court* further explained and affirmed, the

—————————————

[6] Defendant will be filing a separate motion for sanctions relating to this and other relevant evidence that was not preserved.

15

use of the doctrine, makes clear that the concept is flexible, that courts must apply it in light of the sometimes conflicting aims of copyright law, and that its application may well vary depending upon context. Thus, copyright's protection may be stronger where the copyrighted material is fiction, not fact, where it consists of a motion picture rather than a news broadcast, or where it serves an artistic rather than a utilitarian function. Similarly, courts have held that in some circumstances, say, where copyrightable material is bound up with uncopyrightable material, copyright protection is "thin."

*Google* at 1197-98 (citations and parentheticals omitted).

As the *Google Court* also noted, changing technology is a significant factor in analyzing fair use considerations.  This is undoubtedly because the purpose of copyright law is to promote the Progress of Science and useful Arts and to serve the welfare of the public. See U.S. CONST. art. I, § 8, cl. 8; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 n. 10 (1984).  Technology is a major factor in this case.  Digital photographs have completely transformed the nature of photography.  Digital cameras can take high resolution pictures at 10 frames per second and a 128 gigabyte iPhone phone cans store thousands of images.  Plaintiff himself started using a digital camera in 2002 or 2003 [SOMF ¶ 27].  And, Plaintiff used the auto exposure, or computer's programing that is essentially a form of artificial intelligence to take the goat picture  – which raises the question as whether it is the photographer or the software that is actually doing the work when a picture is taken.  In addition, there are simply so many photographs that are uploaded to the internet now that even Google had to stop allowing free cloud photo storage.

In *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 815 (9th Cir. 2003) the Ninth Circuit first considered a case where a photographer sued a search engine.  At the time, around eighty percent

16

of the country still had dial-up internet[7] and large files like pictures and music took a long time

to load.  Arriba was described as follows:

> The search engine at issue in this case is unconventional in that it displays the
> results of a user's query as "thumbnail" images. When a user wants to search the
> internet for information on a certain topic, he or she types a search term into a
> search engine, which then produces a list of web sites that contain information
> relating to the search term. Normally, the list of results is in text format. The
> Arriba search engine, however, produces its list of results as small pictures.

Kelly sued claiming that the display of the thumbnails constituted infringement.   The

*Arriba Court* held that the "use of thumbnail images was a fair use primarily based on the

transformative nature of a search engine and its benefit to the public." *Kelly* at 818–22.

As mentioned above, the Ninth Circuit in *Perfect 10, Inc. v. Amazon.com, Inc.* found that

the display of a thumbnail violated the Plaintiff's copyright, but ultimately found that Google's

indexing of "the entire Perfect 10 image into the search engine results does not diminish the

transformative nature of Google's use."

More recently in *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir.), cert. denied, 140

S. Ct. 122, 205 L. Ed. 2d 41 (2019) the Ninth Circuit discussed the difference between the search

engine that was internal to Zillow's website with a day-to-day search engine.

> [A] search engine is a software program that enables information retrieval by
> helping users find information through the use of keyword queries. But not all
> search engines are created equal. The search engines commonly used for day-to-
> day research are internet-wide search engines, like Google, Yahoo, or Bing. These
> search engines are programs powered by algorithms that search or "crawl" the
> web. A search engine like Google then indexes websites, stores them on a
> database, and runs users' search queries against it. Search results are typically a
> mix of images and text, which include hyperlinks to sources of that content
> elsewhere on the web.

---

[7] See FCC Omnibus Broadband Initiative Paper No. 4 Page 11 https://transition.fcc.gov/national-broadband-plan/broadband-performance-paper.pdf

*Zillow* at 742 (citation to Perfect 10 omitted).

Because Zillow's internal search engine did not crawl the web and because the search results didn't link to the original source of the photo, the *Zillow Court* concluded that the use of the photos by Zillow had not changed their purpose, which was to "artfully depict rooms and properties." *Id.*

The 4Search network was open, crawled the web, and took users directly to the source of a photo.  The search engine was comprised of two different indexes.  Users searching for news would see results from the 4Search index and users searching the broader web were effectively using Microsoft Bing through the 4Search site [SOMF ¶ 20].  The 4Search site then did something with news indexing that other search engines do not do, which is extract the keywords from the metadata to categorize the content to yield more relevant results to the user.  Because search engine indexing of photographs is well settled as fair use, the Court should grant Defendant's motion.  Nevertheless, Defendant analyzes the factors below.

i.  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes

"The central purpose of this investigation is to see ... whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative.  The more transformative the new work, the less important the other factors, including commercialism, become."  *Kelly* at 818 (citing *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579) (1994).

Though the Arriba and Google search engines were clearly commercial in nature that issue was relatively easily dispatched.

> There is no dispute that Arriba operates its web site for commercial purposes and that Kelly's images were part of Arriba's search engine database. As the district court found, while such use of Kelly's images was commercial, it was more incidental and less exploitative in nature than more traditional types of commercial use.  Arriba was neither using Kelly's images to directly promote its web site nor trying to profit by selling Kelly's images. Instead, Kelly's images were among thousands of images in Arriba's search engine database. Because the use of Kelly's images was not highly exploitative, the commercial nature of the use weighs only slightly against a finding of fair use.

*Kelly* at 818.

> In *Perfect 10* the commercial nature was even more stark.

> while Google's use of thumbnails to direct users to AdSense partners containing infringing content adds a commercial dimension that did not exist in Kelly, the district court did not determine that this commercial element was significant.  The district court stated that Google's AdSense programs as a whole contributed "$630 million, or 46% of total revenues" to Google's bottom line, but noted that this figure did not "break down the much smaller amount attributable to websites that contain infringing content.

*Perfect 10* at 1166.

Defendant does not engage in any commercial activity.  Defendant's founder and managing member testified that the company had zero revenues, does not sell advertising, and that the purpose of the company is to try to build a better search index and better technology for the better good or at least to have made a meaningful contribution during his life [SOMF ¶ 35].

Turning to the issue of transformative use, the Court in *Kelly* found that "Arriba's use of the images serves a different function than Kelly's use—improving access to information on the internet versus artistic expression."  *Kelly* at 819.  Similarly, in *Perfect 10*, the Ninth Circuit concluded that "the transformative nature of Google's use is more significant than any incidental superseding use or the minor commercial aspects of Google's search engine and website."

19

*Perfect 10* at 1167. There are two relevant distinctions in *Kelly*. First, Kelly took photographs of the American West.   He did not simply listen to a police scanner and go take pictures of an accident that he was able to come across before the wreck was cleared [Miller Depo. 65:10-15; 118:13-19]. Second, though Defendant's system may create a thumbnail, it does not use or display a thumbnail.

Defendant operates a search engine that is the subject a patent (and continuation) owned by a sister entity.  The search engine was in development in 2018 [Levy Depo. 119:6-12:1].   The process is similar to that described in *Kelly*. *Id*. at 815.  Defendant created a web crawler that scours the internet and indexes the metadata so that if a user does a search the engine will return relevant results.  A legitimate user at 4Jewish.com in 2018 would have put in a search and found what would look like Levy Depo. Ex. 4, which contained an in-line link to the image and the story so clicking on the links above the picture or the picture itself would then take the user to the URL at the NYP site for the story.  Defendant did not download an image to use for advertising a product and it is not a news outlet that simply reproduced Plaintiff's image with its own story.  It is a search engine which, assuming use, "provides an entirely new use for the original work . . ." and is, de jury, transformative. *Perfect 10* at 1165.

ii.  The nature of the copyrighted work

The image at issue is a picture of a goat that was published in a tabloid daily newspaper in conjunction with a story that would best be described as click bait.  Goats are cute, but this wasn't the raising of the flag at Iwo Jima.  And, it wasn't even the only goat picture that accompanied the story.  The NYP used a second picture attributed to the Hackettstown Police Department [Miller Depo. Ex. 3].   The image is not "creative" as contemplated either by *Kelly* or *Perfect 10*.  Rather, it is at best, "thin" in that it depicts an animal found in nature. In *Satava v.*

20

*Lowry*, 323 F.3d 805, 813 (9th Cir. 2003) the Court found a thin copyright in an animal photo

because "an artist may vary the pose, attitude, gesture, muscle structure, facial expression, coat,

or texture of animal [and the] artist may vary the background, lighting, or perspective." Of

course, here, the Plaintiff did none of that. In *Dyer v. Napier*, No. CIV.04 0408 PHX SMM,

2006 WL 2730747, at *9 (D. Ariz. Sept. 25, 2006) applying *Satava* even where the photographer

(with the help of others) "transported a mother mountain lion and her babies to the site [and]

manipulating the animals to present themselves in the scene" the District Court still found that

"[w]hile *Satava's* holding dictates that the subject matter of Plaintiffs' Mother Mountain Lion

Photo—a mother mountain lion perched on a boulder with a kitten in her mouth—is not

copyrightable, Plaintiffs' original contributions to the Mother Mountain Lion Photo enjoy a

"thin" copyright that comprises "no more than his original contribution to ideas already in the

public domain. If Dyer's copyright was thin, then certainly Miller's is non-existent.

   iii. The amount and substantiality of the portion used

      This factor "asks whether the amount and substantiality of the portion used in relation to

the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying."

*Perfect 10* at 1167 (quoting Campbell, supra at 586). Notwithstanding the image is in-line

linked, as Defendant explained at deposition, the 4Search engine did not adjust the size of the

image because it was only serving up whatever was at the source URL which was then then

subject to the user's device and browser settings [SOMF ¶ 18].

   iv.  Effect of use on the market

      The fourth factor is "the effect of the use upon the potential market for or value of the

copyrighted work." *Perfect 10* at 1168. This is "undoubtedly the single most important element

of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985).

There is no market for the goat picture or any other picture taken by the Plaintiff.

> **ROG 7:** Identify the license value of the goat picture as of August 31, 2018, and describe all factors and documents used to calculate that amount.

> **RESPONSE:** Plaintiff receives a day rate from the New York Post, which does not accurately convey the value of his work, as he is paid that same rate whether he takes a thousand pictures when on assignment or none. *Since there are no other licenses for the goat picture*, Plaintiff is producing a comparable license of $1700, which he feels accurately reflects the value of his work.

Miller Depo. Ex. 11; SOMF ¶ 11 (emphasis added).

The NYP story is still posted.[8]  The story is still indexed in the major search engines. The story was "tweeted" and then retweeted over a thousand times.[9]  The image is indexed by Google, Yahoo, and Bing.  Yet in three years there has not been a single request to license the goat picture at issue.  If that's not evidence of a lack of any market, then there is no such thing.

As for the alleged comparable license referred to by Plaintiff, on September 30, 2014, the first known Ebola patient traveled to the United States from Africa.  On October 4, Plaintiff took a picture of a plane passenger that had become ill on a flight to Newark, New Jersey, from Liberia.[10] This would have been the second Ebola patient in the United States in 2014.[11] Plaintiff claims he licensed that photo to ABC news for $1700.  But, Plaintiff cannot produce a signed copy of the release from ABC and cannot produce any evidence that he was ever actually paid in advance of sending out a demand letter [Miller Depo. 98:7-100:13].

---

[8] https://nypost.com/2018/08/09/rogue-goat-may-have-helped-dozens-of-farm-animals-escape/
[9] https://twitter.com/nypost/status/1027703197778038786 (last visited October 21, 2021)
[10] https://nypost.com/2014/10/04/sick-passenger-investigated-for-ebola-at-newark-airport/
[11] https://www.cdc.gov/vhf/ebola/history/2014-2016-outbreak/index.html

Plaintiff is not in the business of licensing photos.  He is effectively a full-time employee of the NYP.  His other source of revenue is being in the business of sending out claims and filing lawsuits.  Plaintiff "produced" over 3,400 pages of documents relating to demands.  He produced 230 pages documenting 51 settlements and has filed 25 lawsuits all relating to pictures taken that were published by the NYP.  Plaintiff himself is just one of ten photographers that Eugene spends his days hunting for claims to bring [SOMF ¶ 4].

<u>v.  Other Factors</u>

Defendant is a nascent search engine that is trying to make search better.  In 2018 (and still today) 4Search was a development server or system.  Plaintiff and his lawyers[12] are functionally racketeers that use the courts to extract money from parties without regard to any legal analysis.[13]  According to Pacer, Miller has filed 25 lawsuits all over pictures that are observable by any person who happened to be there.  Sadowski has filed 134.  Higbee has filed 149.  His wife who is licensed in Florida has filed 75.  Rayminh Ngo who is licensed in New York and is "of counsel" at Higbee & Associates and has represented Miller has filed 104.  And of course, Richard Liebowitz has filed over 2,000 cases.

_____

[12] Counsel apparently honed the craft of filing shakedown lawsuits before becoming champions of photographers.  *L. Offs. of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 565, 153 Cal. Rptr. 3d 865, 881 (2013) (Nothing in this opinion is meant to suggest that we approve of the revival of <u>shakedown lawsuits</u> . . .) (emphasis added).

[13] The Sadowskis engaged in something of an Abbott and Costello routine.  Chris says any fair use analysis was up to Gene [Chris Depo. 15:4-25].  Gene said it was up to Higbee [Eugene Depo. 17:2-16].  Higbee is of course not interested in defenses.  See, e.g., *Scholossberg v. Luong*, No. 19-cv-02497 (N.D. Cal.) ([ECF No. 1](#) pp. 18-24); *The Mockingbird Foundation v. Luong*, No. 3:19-cv-05671 (N.D. Cal.) ([ECF No. 35](#)).

The patent and copyright clause enables Congress the right to pass laws that promote the Progress of Science and useful Arts.  Not finding that any use by Defendant was "fair use" actually impedes the progress of science and does nothing to promote art.  Indeed, placing any liability on Defendant under these circumstances would be contrary to the very purpose of the patent and copyright clause.

**F.  DMCA Immunity**

Liability for copyright infringement by internet service providers is limited by the Digital Millennium Copyright Act ("DMCA").  See *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186–87 (D.D.C. 2005).  The term service provider is defined by 17 U.S.C. § 512(k)(1).   Subsection (k)(1)(A) applies to liability limitations under 17 U.S.C. § 512(a).  Subsection (k)(1)(B) applies to all of the other limitations under § 512.  Defendant is a service provider under both definitions [SOMF ¶ 30-24] and Defendant has no subscribers or account holders and otherwise satisfies the conditions of § 512(i) [SOMF ¶ 26].

i.  Section 512(a)

The Ninth Circuit addressed subsection (a) in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1116 (9th Cir. 2007).  There the Court found that

Section 512(a) provides a broad grant of immunity to service providers whose connection with the material is transient. When an individual clicks on an Internet link, his computer sends a request for the information. The company receiving that request sends that request on to another computer, which sends it on to another. After a series of such transmissions, the request arrives at the computer that stores the information. The requested information is then returned in milliseconds, not necessarily along the same path. In passing the information along, each intervening computer makes a short-lived copy of the data. A short time later, the information is displayed on the user's computer.

Those intervening computers provide transient connections among users. The Internet as we know it simply cannot exist if those intervening computers must block indirectly infringing content. We read § 512(a)'s grant of immunity exactly

24

as it is written: Service providers are immune for transmitting all digital online communications, not just those that directly infringe.

There are no cases where search engine search related features have not been considered a service provider.  Even Perfect 10 did not dispute that Google was a service provider under section 512(k).  See *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 AHM SHX, 2010 WL 9479059, at *4 (C.D. Cal. July 26, 2010) (Moreover, Google points out—and P10 does not dispute—that Web Search, Image Search, and the caching feature do not have account holders or subscribers, CSUF(d) ¶ 23. P10 does not contend that Google must, or even can, have a repeat infringer policy for those services. See 17 U.S.C. § 512(i)(1)(A) (requiring a repeat infringer policy for those services with "subscribers and account holders")).

ii.  512(b)

This section simply provides immunity for system caching.  Defendant has not alleged that Plaintiff's caching of images is infringing, but Defendant has demonstrated that nothing resides on its server, but the contents of page that is pulled will be temporarily saved in the cache so if a user is doing the same search over and over again it will use fewer system resources to re-render the page [Levy Depo. 126:16-127:1].

**G.  License**

"A copyright owner may grant a nonexclusive license expressly or impliedly through conduct.  An implied license can be found where the copyright holder engages in conduct "from which the other party may properly infer that the owner consents to his use. Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it." *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115–16 (D. Nev. 2006) (citations and quotation marks omitted).

In *Field*, the District Court found an implied license exists where an author put content on his website and failed to inform Google via metatags that the page should not be indexed or the contents archived. Here, Plaintiff takes several pictures and sends them to the photo editor under an express license with the NYP. That agreement grants the NYP the right to use the photo in anyway it wants for its own purposes and allows NYP the right itself to grant sublicenses [SOMF ¶ 1]. The NYP uses RSS, which is a service that tells search engine web crawlers to include their site in the index. The 4Search system would have indexed the article and image page per the NYP RSS instructions around August 9 [SOMF ¶ 15]. This is a technical way of saying what is presumably understood. The NYP wants to be indexed in every search engine because what it wants is traffic. The metadata and metatags from the particular page are stored in the 4Search index and database. When Eugene did his search and clicked on the result the 4Search system then generated the page [SOMF ¶ 17]. As the Court can see by comparing Levy Depo. Ex. 10 (line 192 and 197-199), which is the html (computer code) behind the NYP page and Levy Depo. Ex. 8 (page 4) the source of the image is the source the NYP provided and is in fact the image as stored by the NYP. In *Field*, it was enough that the Plaintiff could have told Google not to index or cache the page. Here, the NYP was granted an express license and the right to sublicense and by including the page in the RSS feed and actively telling search engines like Defendant to index it, this is conduct that indisputably created a license. That license is of course terminable by the Plaintiff and upon receipt of a demand from Plaintiff's counsel, Defendant removed the page containing the link to the image from being accessible [SOMF ¶ 37].

**H.  17 U.S.C. §§ 102(a)(5) and 410(c) are Together Unconstitutional as Applied**

Defendant brings an "as-applied" challenge to 17 U.S.C. §§ 102(a)(5) and 410(c). An as-applied attack "challenges only one of the rules in a statute, a subset of the statute's

26

applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can separate valid from invalid subrules or applications." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (citations and quotation marks omitted).

The basis for the challenge is not particularly complicated.  Taken together, every photograph, except maybe a picture of a picture, is entitled to copyright registration.  The copyright office itself informs the public that most photographs are protectible (Copyright Circular 42), though there is nothing to suggest that any photograph has ever been refused registration based on a lack of sufficient creative expression.  Effectively, copyright law for photographs continues to exist based on the notion that "no photograph, however simple, can be unaffected by the personal influence of the author." *Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y.1921) as cited in *Ets-Hokin*, supra. Though that may well have been the case in 1921, it is most certainly no longer true.  What is true is that photographs are treated differently than other media based solely on the fiction that that every picture, except those that "slavishly" copy some pre-existing work, is inherently original because there might have been some creative choice made.  See *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 519 (7th Cir. 2009).  The same is irrationally not true for books, maps, and articles of fashion. *Darden v. Peters*, 488 F.3d 277 (4th Cir. 2007); *Royal Printex, Inc. v. Unicolors, Inc.*, No. CV 07-05395-VBK, 2009 WL 2712055 (C.D. Cal. Aug. 25, 2009); *3D, Ltd. v. Spectratek Techs., Inc.*, 41 F. App'x 931 (9th Cir. 2002).

In *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 556 (2013) the Supreme Court, addressing the continued constitutionality of the preclearance sections of the Voting Rights Act invalidated the statute because the 2006 reauthorization was based on the then 40-year-old coverage formula,

and went on to find that had the statute been enacted in 2006 based on 40 year old data it would have been irrational.  As a result, the Court in *Shelby County* found the statute unconstitutional.

Section 102 was adopted in October 1976 and amended to add architectural works in 1990.  Section 410 was adopted in the same 1976 act as Section 102.  See Pub.L. 94-553.  In 1976 it took work to take pictures.  Film had to be used and cameras had to be focused and the film later developed without having been first accidentally exposed.  But, times have rapidly changed.  Now, virtually every cell phone has a high-quality digital camera.  Anyone with a phone can take pictures or record video anywhere.  There is effectively no limit on the number of pictures that can be taken.  One need not worry about how many pictures are left in the roll of film and the photographer can instantly see if they got the smile or image they were seeking.

In 2015, Google launched Google Photos to allow people to store pictures.  As of 2012, Facebook announced that than 300 million photos per day were being uploaded to its service.  In 2017, Snapchat announced that over 2.5 Billion "Snaps" were being created each day [SOMF ¶ 29].  As of November 11, 2020, there were more than 4 Trillion images stored in Google Photos with 28 Billion new photos and videos being uploaded every week [SOMF ¶ 28-29].   In three months during  2021, Tik Tok removed over 81 million which[14] translates into over 32 billion uploads.

"The eighth section of the first article of the constitution is the great repository of the powers of congress, and by the eight clause of that section congress is authorized to promote the progress of science and useful arts, by securing, for limited times to authors and inventors the

---

[14] See https://www.tiktok.com/safety/resources/tiktok-transparency-report-2021-q-2?lang=en

exclusive right to their respective writings and discoveries." *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 56 (1884).

The requirements for creativity for photographs are expressed as minimal but in reality they are practically, if not actually, non-existent because photographers can make up completely subjective and untestable claims after the fact to justify what courts will accept as the minimal amount of creativity. With a copyright registration comes the presumption that a photograph meets the minimum threshold and the burden shifts to a Defendant to effectively try to prove a negative. Consider the Cohen photo above. Any of those photographers could, after the fact, say they made choices that they didn't really make and in the absence of evidence to the contrary, it leaves a Defendant in an impossible position.

 It would be irrational for Congress today to create a statute that made virtually every picture and video entitled to copyright protection. The sheer volume of pictures and the ease with which photographs can be created it cannot be rationally concluded that it promotes the useful arts to entitle photographs to copyright protection. The result is not just protection, but the creation of an unmeetable burden on Defendants to prove a photograph is not entitled to protection. Consider the photograph of the monkey. The copyright office would assume the photographer made a conscious choice as to the angle, the lighting, the perspective, etc. If a lawsuit were filed, the photographer would be able to make these claims, and no one could disprove it. As it turns out, this was one of many "selfies" taken by a monkey and was the subject of *Naruto v. Slater*, 888 F.3d 418 (9th Cir. 2018) where the Ninth Circuit concluded that PETA could not be Naruto's next friend for standing purposes. The point is that literally a monkey can take a picture. And, as noted above, monkeys are not alone as dogs can take videos.

29

There are also cameras mounted on dashboards, helmets, and doorbells that record images without any actual creative input.

In *Burrow-Giles*, supra at 60, the photographer put "Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories . . . arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression . . ." and the existence of those facts was a sufficient work of art to be entitled to copyright.  Given the technological developments that allow anyone to take a picture and now allow for the creation of over a Trillion pictures a year, Sections 102(a)(5) and 410(c) of the Copyright Act is no longer permitted under Art. I, § 8, cl. 8. because it in no way promotes the useful arts to entitle virtually every picture to registration and the presumption of originality.  The Copyright Clause requires something much closer to actual evidence of what the *Burrow-Giles Court* identified as being sufficient.  Having the minimal physical dexterity to press a button or tell Siri to take a picture cannot satisfy the constitutional requirement.  The Court should so find and disregard the certificate of registration in this case and shift the burden back on the Plaintiff to prove objective measures of creativity.

**IV.  Conclusion**

For the reasons discussed above, there being no genuine issues of fact, Defendant respectfully requests that this Court grant its motion for summary judgment.

This the 1st day of November, 2021.

/s/ Ryan Isenberg
Ryan L. Isenberg

30

**Certificate of Service**

This is to certify that I have this day served the within and foregoing Motion for Summary Judgment upon Plaintiff by filing the same using the Court's CM\ECF system, which will generate notice to the following counsel of record:

Mathew Higbee - mhigbee@higbeeassociates.com

Ryan Carreon - rcarreon@higbeeassociates.com

This the 1st day of November, 2021.

/s/ Ryan Isenberg
Ryan L. Isenberg

31

1
2
3

**INDEX TO EXHIBITS**

| Exhibit | Description |
|---|---|
| A | Deposition Excerpts of Robert Miller |
| A-1 | Miller Depo. Ex. 1 (NYP Production) |
| A- 2 | Miller Depo. Ex. 2 (Rachman E-mail) |
| A- 3 | Miller Depo. Ex. 3 (Fred the Goat Story) |
| A-4 | Miller Depo. Ex. 6 (GS to RM E-mail) |
| A-5 | Miller Depo. Ex. 7 (GS to RM E-mail) |
| A-6 | Miller Depo. Ex. 8 (Goat copyright certificate) |
| A-7 | Miller Depo. Ex. 11 (Miller Resp. to ROGS) |
| A-8 | Miller Depo. Ex. 14 (unsigned license) |
| B | Deposition Excerpts of Michael Levy |
| B-1 | Levy Depo. Ex. 4 (result page) |
| B-2 | Levy Depo. Ex. 8 (html of 4jewish.com page) |
| B-3 | Levy Depo. Ex. 10 (html of NYP story page (10/01/2018) |
| B-4 | Levy Depo. Ex. 11 (Higbee Visits) (Filed Manually) |
| B-5 | Levy Depo. Ex. 13 (html of NYP story page (01/11/2018) |
| B-6 | Levy Depo. Ex. 14 (Blacklisted images) (Filed Manually) |
| B-7 | Levy Depo. Ex. 18 (NYP RSS feed – 01/20/20) |
| B-8 | Levy Depo. Ex. 20 (visits to the goat page) (Filed Manually) |
| B-9 | Levy Depo. Ex. 22 (Amended Expert Report) |
| C | Levy Declaration |
| D | Google Documents |
| E | Deposition Excerpts of Christopher Sadowski |
| F | Deposition Excerpts of Eugene Sadowski |
| F-1 | Eugene Depo. Ex. 2 (nutty news demand) |
| F-2 | Eugene Depo. Ex. 7 (pages 3-4 only) |