

Mathew K. Higbee, Esq., SBN 11158
Ryan E. Carreon, *pro hac vice*
**HIGBEE & ASSOCIATES**
2445 Fire Mesa St., Suite 150
Las Vegas, NV 89128
(714) 617-8373
(714) 597-6729 facsimile
Email: mhigbee@higbeeassociates.com
rcarreon@higbeeassociates.com

Attorney for Plaintiff,
ROBERT MILLER

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**LAS VEGAS DIVISION**

| | |
|---|---|
| ROBERT MILLER, | Case No. 2:18-cv-02097-JAD-VCF |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| 4INTERNET, LLC; and DOES 1 through 10 inclusive, | |
| Defendants.. | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiff Robert Miller will move for Summary Judgment against Defendant 4Internet, LLC pursuant to Federal Rules of Civil Procedure 56(a).

This Motion is based on this Notice of Motion, the attached memorandum of points and authorities, the declaration of Ryan E. Carreon, Robert Miller, and Eugene Sadowski in support, the Separate Statement of Undisputed Facts, Index of Exhibits and Evidence, and the pleadings, files and other materials that are on file with the Court or may be presented at the hearing.

Dated: November 1, 2021                     Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
*Pro Hac Vice*
**HIGBEE & ASSOCIATES**
2445 Fire Mesa St., Suite 150
Las Vegas, NV 89128
(714) 617-8373
(714) 597-6559 facsimile
rcarreon@higbeeassociates.com

**MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................ 1

       A.     Robert Miller Is A Professional Photographer ..................... 1

       B.     4Internet Owns And Operates The 4Search Network ........... 2

       C.     Miller Captured A Photograph Of Fred The Goat................. 3

       D.     4Internet's Infringing Conduct Is Discovered ..................... 4

II.    LEGAL STANDARD ................................................................... 6

       A.     Summary Judgment Standard ............................................... 6

III.   4INTERNET'S INFRINGING CONDUCT IS NOT DISPUTED ............. 6

       A.     Miller Has Established *Prima Facie* Copyright Infringement ............. 6

              1.     Miller's Goat Photograph Is Sufficiently Original To
                     Qualify For Copyright Protection.................................. 7

              2.     4Internet Is Directly Liable For Copyright Infringement........... 9

                     a.     4Internet's use of an inline link violates Miller's
                            exclusive right to display the Goat Photograph. ........... 11

              3.     4Internet Is Also Vicariously Liable For Infringement........... 13

       B.     Miller Can Seek Statutory Damages And Attorneys' Fees. ............... 14

IV.    4INTERNET'S AFFIRMATIVE DEFENSES MUST FAIL ....................... 15

       A.     Miller Has Sufficiently Stated A Claim................................ 15

       B.     Miller's Goat Photograph Is Sufficiently Creative ............... 15

       C.     4Internet's Conduct Was Not A Fair Use............................. 15

              1.     The Purpose And Character Of The Use Weighs Against
                     A Finding Of Fair Use........................................... 15

              2.     The Nature Of The Copyrighted Work Weighs Against A
                     Finding Of Fair Use............................................. 16

              3.     The Amount And Substantiality Of The Portions Used
                     Weighs Against A Finding Of Fair Use. ......................... 17

              4.     The Effect On The Market Place Weighs Against Fair
                     Use.......................................................... 17

       D.     4Internet Cannot Prove Unclean Hands ............................. 18

       E.     4Internet Does Not Have An Implied License ..................... 19

**MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

F.    4Internet Does Not Have A License From Twitter ........................... 20

G.    Miller's Goat Photograph Is Sufficiently Original ............................ 21

H.    4Internet's DMCA Defense Is Factually Inaccurate......................... 21

I.    4Internet's Constitutional Challenge Is Nonsensical......................... 23

V.    CONCLUSION ........................................................................ 24

**MOTION FOR SUMMARY JUDGMENT**

1

## <u>TABLE OF AUTHORITIES</u>

2

## <u>CASES</u>

3

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).............................................................................................................. 7, 9

4

5

*ABC, Inc. v. Aereo, Inc*., 573 U.S. 431, 454-56 (2014)............................................ 10

6

*Agence Fr. Presse v. Morel* , 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011)........................................................................................................................ 21

7

*Agence Fr. Presse v. Morel* , 934 F. Supp. 2d 547, 559 (S.D.N.Y. 2013)........................................................................................................................ 21

8

9

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, (1986) ..................................... 6

10

*Asset Marketing Systems, Inc v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008)........................................................................................................................ 20

11

*Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884).............................. 8

12

*Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 579, (1994) ........................... 16

13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)................................................. 6

14

*Educational Testing Service v. Simon,* 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999) ........................................................................................................ 7

15

16

*Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) ................................... 13

17

*Feist Pubs., Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991) ....................... 7

18

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-64 (9th Cir. 1996)................................................................................................................... 13, 14

19

*Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2013) ........................................................................................................... 9

20

21

*Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019).................................................................................................................. 13

22

*Funky Films, Inc. v. Time Warner Entm't Co*., 462 F.3d 1072, 1076 (9th Cir. 2006) .......................................................................................................... 7

23

24

*Gen-Prob, Inc. v. Amoco Corp*., 926 F. Supp. 948, 952 (S.D. Cal. 1997)........................................................................................................................ 19

25

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018) .............................................................................................. 12, 13

26

27

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.* 871 F.Supp. 709, 720 (S.D.N.Y. 1995) .................................................................. 19

28

*Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y. 1921) ......................................................................................................... 8

v

*Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc.*, 853 F.3d 1020, 1027 (9th Cir. 2017) ....................................................................... 21

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, n.9 (2005) ......................................................................................... 13

*Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1181 (9th Cir. 2012) ................ 17

*Otto v. Hearst Comms., Inc.*, 345 F. Supp. 3d 412, 428 (S.D.N.Y. 2018)................................................................................................. 16

*Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 764-65 (9th Cir. 2007)............. 21, 22

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) ..................... 9

*Pro Arts, Inc. v. Hustler Magazine, Inc.* 787 F.2d 592 (6th Cir. 1986) .................. 17

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir.1989) ...................... 7

*Sadowski v. BackChina* 2018 U.S. Dist. LEXIS 120875 at *4 (S.D. Tex. July 16, 2018)................................................................................. 18

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 471 U.S. 539, 565 (1985) ................. 17

*Survivor Prods. LLC v. Fox Broad Co.*, 2001 WL 35829270, at *3 (C.D. Cal. June 12, 2001)................................................................. 18

*The Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) ....................................... 13

*Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1281-82 (M.D. Fla. 2008).............................................................................................. 19

*UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.,* 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006) ............................................................. 7

*Veeck v. S. Bldg. Code Cong. Int'l Inc.*, 241 F.3d 398, 409 (5th Cir. 2001)............................................................................................... 19

*VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 742 (9th Cir. 2019)......................... 15

*Zacchini v. Scripps-Howard*, 433 U.S. 562, 574-78 (1977).................................... 23

**STATUTES**

17 U.S.C. § 101 .......................................................................................... 13

17 U.S.C. § 102(a)(5) .................................................................................... 7

17 U.S.C. § 106 ............................................................................................ 7

17 U.S.C. § 106(3) ...................................................................................... 20

17 U.S.C. § 106(5) ...................................................................................... 11

17 U.S.C. § 107 .......................................................................................... 15

**MOTION FOR SUMMARY JUDGMENT**

17 U.S.C. § 401(a) ............................................................................................... 19

17 U.S.C. § 410(c) ................................................................................................. 7

17 U.S.C. § 412(2) ............................................................................................... 14

17 U.S.C. § 512(a) ............................................................................................... 22

17 U.S.C. § 512(b) ............................................................................................... 22

## **TREATIES**

Berne Convention Implementation Act of 1988, Pub.L. No. 100–568,
102 Stat. 2853 (1988) ........................................................................................... 19

**MOTION FOR SUMMARY JUDGMENT**

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.      INTRODUCTION**

3

**A.      Robert Miller Is A Professional Photographer**

4

Plaintiff Robert Miller ("Miller") has been a professional photographer since

5

1991. Separate Statement of Undisputed Facts ("SSUF") No. 1. In 1991 Miller

6

graduated with a B.F.A. from The Cooper Union which he attended on full

7

scholarship. SSUF No. 2

8

Miller's photographs have been published in numerous magazines and

9

newspapers such as *Time, Newsweek, LIFE, US News and World Report, Business*

10

*Week, Stern, Der Speigel, Paris Match, Rolling Stone, Vanity Fair, Elle, People,*

11

*New York Magazine, The London Times, The South China Morning Post, USA*

12

*Today, The New York Times, NY Daily News, Newsday,* and *VOICE.* SSUF No. 3.

13

Miller's work on 9/11 is in the permanent collection in The Library of Congress,

14

published in several books was also included in a Bill Moyers *Frontline*

15

documentary about 9/11 that appeared on PBS. SSUF No. 4.

16

In approximately 2000 or 2001, Miller began working as a freelancer for the

17

New York Post ("Post"), and he continues to freelance for the Post today. SSUF No.

18

5. Under this arrangement, Miller charges the Post a negotiated flat rate per shift for

19

a non-exclusive editorial license to the photographs that he takes during that shift,

20

and in exchange he gets to keep the copyrights to the photographs, which he can

21

then license to third parties. SSUF No. 6. Often, Miller is able to take photographs of

22

interesting or notable events, and since he retains the copyrights to his photographs,

23

his is able to command significant licensing value on the secondary market. SSUF

24

No. 7.

25

Millers typically never allows his photos to be used without payment of a

26

license fee. SSUF No. 8. Since photography is Miller's sole job, he depends on the

27

payment of license fees in order to make a living. SSUF No. 9. The unauthorized use

28

of Miller's photographs has led to a rapid decline in the number of paid licenses and

1

1   impacts the overall value of his photographs by diminishing exclusivity and causing

2   Miller to have to devote significant amounts of time and money to detecting and

3   pursuing infringements. SSUF No. 10.

4   **B.      4Internet Owns And Operates The 4Search Network**

5        Founded in 2010, Defendant 4Internet, LLC ("4Internet") is a company that

6   registers and sells domains and hosts web servers. SSUF No. 11. Two of the

7   domains    that    4Internet   owns    are    www.4jewish.com    ("4Jewish")    and

8   www.4rightwing.com ("4RightWing"). SSUF No. 12.

9        4Internet owns and operates over 1,000 domains in the "4Search network" all

10  of which begin number "4" followed by a topic or "affinity type." SSUF No. 13. The

11  purpose of 4Internet utilizing these affinity types is to allow users to self-select so

12  that they can receive targeted search results based on topics of interest. SSUF No.

13  14.

14       This targeted search functionality begins with "seed points" which are

15  domains preselected by 4Internet based on their relevance to a specific affinity type

16  and that act as a starting point for a particular search conducted on one of the

17  websites in the 4Search network. For example, one seed point for 4RightWing was a

18  Wikipedia page that identified certain news outlets as right-wing and which was

19  coded by 4Internet into its search algorithm. SSUF No. 15. Web crawlers start at

20  these seed points and compile information deemed relevant into an "index" which is

21  an organized compilation of information designed to be accessed quickly to produce

22  a set of search results in response to a search query. SSUF No. 16.

23       Once a webpage is indexed, it remains in the 4Internet index until a user

24  performs a search query. SSUF No. 17. After a query is entered into one of the

25  domains in the 4Search network, a web page is generated based on specifications

26  provided by 4Internet which tells the index which information to use to populate the

27  page and how to compile that information to display through a user's browser. For

28  example, 4Internet can set a limit to the amount of text that populates from the index

1    or can cause indexed photographs to be displayed or completely blocked on the page

2    that iss generated. SSUF No. 18.

3    **C.    Miller Captured A Photograph Of Fred The Goat**

4         Miller is the sole creator of a photograph of "Fred the Goat" ("Goat

5    Photograph"). SSUF No. 19.

6         On August 9, 2018, Miller was given an assignment by the Post to investigate

7    the mass break out of dozens of goats and sheep from a slaughterhouse in

8    Hackettstown, New Jersey. Approximately one year earlier a goat that the locals

9    nicknamed "Fred" had escaped from the same slaughterhouse and had been living in

10   the area ever since. After the mass breakout, police received a tip that Fred was also

11   spotted in the area. Police and residents were able to herd about 60 of the animals

12   back to their pens, but many remained on the loose. Sometime after the animals were

13   rounded up, Fred was spotted headbutting the gate to their pen, apparently in an

14   effort to help them escape again. This second sighting of Fred led to speculation that

15   Fred had facilitated the initial breakout. SSUF No. 20.

16        Miller packed two of his Cannon cameras and approximately two or three

17   different camera lenses and drove to Hackettstown. SSUF No. 21. When Miller

18   arrived in Hackettstown, he drove through the middle of town but did not see any

19   goats and I wound up near the train tracks. Miller got out of his car and noticed a

20   police officer speaking to a different media outlet. Miller listened as he described the

21   area of town in Fred had been sighted. Subsequently, as Miller was returning to his

22   car, to his great surprise, Miller saw Fred the goat standing a few hundred feet in

23   front of him. SSUF No. 22.

24        Miller quickly chose the camera and lens that he thought would produce the

25   most compelling photograph based on the circumstances and his, experience and

26   adjusted the settings such as the ISO and shutter speed. Specifically, Miller knew

27   that Fred the goat would be moving, and he chose the specific camera settings and

28   lens to create a sharp focus and minimize blur -- ideally trying to keep the front of

**MOTION FOR SUMMARY JUDGMENT**

the goat's foot to the rear part of the goat's foot in focus, while dropping the background out of focus so that the goat pops out to the viewer. Miller also used a low ISO setting, because low ISO creates less grain, whereas more grain means more contrast on the image has making it less clear. While photographing Fred, Miller determined the framing and angle of each of the shots. For example, Miller wanted to take a picture of Fred from the side as opposed to straight on, Miller also wanted to make sure that Fred's whole body was in frame and that Miller was shooting from a perspective to take advantage of the best lighting possible, and Miller also tried to minimize the visual interference of any background elements. Miller also used his professional skill and experience to determine the precise moment in time to take the photographs, for example, Miller waited to make sure Fred's head was raised up, and to make sure that his posture and positioning would create the most visually appealing shot. SSUF No. 23.

After the assignment was completed, Miller submitted approximately 30 photographs to the Post, including the Goat Photograph. SSUF No. 24. Later that evening, the Post ran a story with the Goat Photograph titled "Rouge goat may have helped dozens of farm animals escape" ("Post Article"). SSUF No. 25.

Miller subsequently registered the Goat Photograph with the United States Copyright Office on September 25, 2018 and was issued registration certificate VA 2-120-723. SSUF No. 26. The Goat Photograph is listed on registration certificate VA 2-120-723 as 8.9.18._FRed_the goat_.Miller.jpg. SSUF No. 27.

**D.    4Internet's Infringing Conduct Is Discovered**

On or about August 31, 2018 Eugene Sadowski ("Sadowski") conducted a Google reverse image search and discovered the Goat Photograph at issue in this case being displayed on two websites, www.4jewish.com and www.4rightwing.com. SSUF No. 28. The pages on 4Jewish and 4RightWing featuring the Goat Photograph were generated using information that had been indexed by 4Internet from the RSS feed originating from the Post's website at www.nypost.com/feed which is indexed

by 4Internet in regular intervals. SSUF No. 29. The Goat Photograph was not pulled from Twitter or any other source other than the Post's RSS feed. SSUF No. 30.

According to Post's "Terms of Service" from August 2018, "all content, features, and functionality … ('Services')" of the Post's website "are to be used solely for your non-exclusive, non-assignable, non-transferable and limited personal use and for no other purposes" and "you shall not, nor shall you allow any third party (whether or not for your benefit or otherwise) to, frame, reproduce, modify, create derivative works from, display, perform, publish, distribute, disseminate, broadcast or circulate to any third party (including, without limitation, on or via a third-party website or platform), or otherwise use, any Content without the express, prior written consent of Company or its owner if Company is not the owner." SSUF No. 31.

The Goat Photograph was displayed on 4Jewish and 4RightWing via an inline link directly from the Post's website without any alteration by 4Internet. SSUF No. 32. The Goat Photograph displayed on 4Jewish and 4RightWing was not a thumbnail, but rather was a full-sized image because thumbnail images were too small and too low quality for 4Internet's purposes. SSUF No. 33.

The Goat Photograph was displayed on 4Jewish and 4RightWing above text from the Post Article. SSUF No. 34. 4Internet never contacted the Post to obtain permission to use any of the content from the Post's RSS Feed on 4Jewish or 4RightWing, including the text and the Goat Photograph. SSUF No. 35.

After discovering the Goat Photograph on 4Jewish and 4RightWing, Sadowski alerted Miller of the discovery by email and attempted to take screenshots of the webpages. SSUF No. 36. Due to a malfunction in the screenshotting program used by Sadowski, the August 31, 2018 full page screenshot of the page on 4Jewish generated a fragmented image, however counsel for Miller subsequently prepared a corrected version which, to Sadowski's recollection, appears to accurately reflect how the page displaying the Goat Photograph on 4Jewish appeared on August 31,

5

**MOTION FOR SUMMARY JUDGMENT**

2018. SSUF No. 37. At the time the August 31, 2018 screenshots were taken, 4Internet was actively developing the appearance and functionality of its webpages in order to try figure out what users would respond to which resulted in numerous changes that occurred day to day, hour by hour, or sometime even click by click. SSUF No. 38.

On September 21, 2018, Sadowski again visited the 4Jewish page displaying the Goat Photograph. SSUF No. 39. Sadowski noticed that both the page displaying the Goat Photograph as well as the design of the 4Jewish website had changed and took another screenshot. SSUF No. 40.

Miller did not ever license my Goat Photograph to 4Internet, LLC, or otherwise give it permission to display the Goat Photograph on any of its websites. SSUF No. 41.

## II.   LEGAL STANDARD
### A.   Summary Judgment Standard

Summary judgment is appropriate if the pleadings and the evidence demonstrate "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the non-moving party fails to offer "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). The moving party need only point to the absence of evidence proffered by the non-moving party. *Celotex*, 477 U.S. at 325.

## III.   4INTERNET'S INFRINGING CONDUCT IS NOT DISPUTED
### A.   Miller Has Established *Prima Facie* Copyright Infringement

To establish a prima facie case of copyright infringement, a plaintiff "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent

elements of the work that are original.'" *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights" under 17 U.S.C. § 106. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (quotation omitted)). These exclusive rights include the right to reproduce, distribute, publicly display, perform, or create derivative works of the copyrighted work. *See* 17 U.S.C. § 106.

A plaintiff need not demonstrate the defendant's intent to infringe the copyright in order to demonstrate copyright infringement. *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.,* 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006); *see also Educational Testing Service v. Simon,* 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999) (copyright infringement "is a strict liability tort").

### 1. *Miller's Goat Photograph Is Sufficiently Original To Qualify For Copyright Protection.*

A certificate of registration validly obtained from the Copyright Office within five years of first publication of a work constitutes *prima facie* evidence of the originality of the work and of the facts stated therein, including ownership. *See* 17 U.S.C. § 410(c).

It is undisputed that Miller created the Goat Photograph on August 9, 2018 and registered it with an effective registration date of September 25, 2018. *See* SSUF Nos. 19-27. Thus, Miller's Goat Photograph is entitled to this statutory presumption because it was registered with the Copyright Office within five years of publication. *See* 17 U.S.C. § 410(c).

Even if not afforded the statutory presumption of originality, the Goat Photograph easily makes the grade. Photographs have long been the subject of copyright. *See* 17 U.S.C. § 102(a)(5) (extending copyright protection to "pictorial, graphic, and sculptural works"). In the seminal case protecting photos, the Supreme

Court held that a photographic portrait of Oscar Wilde was entitled to copyright protection because of various creative elements employed by the photographer. *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884); *see also Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074 (9th Cir. 2000) (affirming copyrightability of photograph of vodka bottle and noting the "prevailing view" that "almost any[] photograph may claim the necessary originality to support a copyright merely by virtue of the photographers' [sic] personal choice of subject matter, angle of photograph, lighting, and determination of the precise time when the photograph is to be taken."); *see also Jewelers' Circular Pub. Co. v. Keystone Pub. Co*., 274 F. 932, 934 (S.D.N.Y. 1921) ("no photograph, however simple, can be unaffected by the personal influence of the author.") (Hand, J.).

Here, it is not disputed that the Miller made numerous creative decisions when creating the Goat Photograph. For example, Miller took multiple cameras and lenses with him on the assignment, and upon spotting Fred the Goat, made a creative decision to choose the camera and lens that he thought would produce the most compelling photograph based on the circumstances and his, experience. SSUF No. 23. In addition, Miller adjusted the camera settings, to create a sharp focus and minimize blur -- ideally trying to keep the front of the goat's foot to the rear part of the goat's foot in focus, while dropping the background out of focus so that the goat pops out to the viewer. *Ibid*.

Miller also used a low ISO setting, because low ISO creates less grain, whereas more grain means more contrast on the image making it less clear. *Ibid*. Miller also determined the framing and angle of each of the shots, including making the creative decision to capture Fred from the side as opposed to straight on. *Ibid*. Miller also wanted to make sure that Fred's whole body was in frame and that Miller was shooting from a perspective to take advantage of the best lighting possible, and Miller also tried to minimize the visual interference of any background elements. *Ibid*. Miller also used his professional skill and experience to determine the precise

moment in time to take the photographs, for example, Miller waited to make sure Fred's head was raised up, and to make sure that his posture and positioning would create the most visually appealing shot. *Ibid*.

These creative decisions are sufficient to meet the relatively low bar for originality. *See Feist Publ'ns, Inc.* 499 U.S. at 345 ("To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.")

Therefore, Plaintiffs should be granted summary judgment as to the first element of copyright infringement.

## 2.   4Internet Is Directly Liable For Copyright Infringement.

To establish a prima facie case of direct infringement, a plaintiff "must show ownership of the allegedly infringed material" and "demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records,* 239 F.3d at 1013. In addition, direct infringement requires the plaintiff to show causation (also referred to as "volitional conduct") by the defendant. *See Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2013).

The word "volition" in this context does not really mean an "act of willing or choosing" or an "act of deciding," rather, it "simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657, 666 (9th Cir. 2017) (quotation omitted).

The late Supreme Court Justice Antonin Scalia described that a system that responds automatically to user input may still satisfy the volitional conduct requirement if it is involved in the selection, coordination, or arrangement of the content that the user interacts with:

> Most of the time that issue will come down to who selects the copyrighted content: the defendant or its customers. [citation]
>
> A comparison between copy shops and video-on-demand services illustrates the point. A copy shop rents out photocopiers on a per-use basis. One

9

**MOTION FOR SUMMARY JUDGMENT**

1
2
3
4

customer might copy his 10-year-old's drawings—a perfectly lawful thing to do—while another might duplicate a famous artist's copyrighted photographs—a use clearly prohibited by §106(1). Either way, the customer chooses the content and activates the copying function; the photocopier does nothing except in response to the customer's commands. Because the shop plays no role in selecting the content, it cannot be held directly liable when a customer makes an infringing copy. [citation]

5
6
7
8

Video-on-demand services, like photocopiers, respond automatically to user input, but they differ in one crucial respect: They choose the content. When a user signs in to Netflix, for example, "thousands of . . . movies [and] TV episodes" carefully curated by Netflix are "available to watch instantly." [citation]. That selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works and thus serves as a basis for direct liability.

9
10
11
12

The distinction between direct and secondary liability would collapse if there were not a clear rule for determining whether the defendant committed the infringing act. [citation]. The volitional-conduct requirement supplies that rule; its purpose is not to excuse defendants from accountability, but to channel the claims against them into the correct analytical track. [citation]. Thus, in the example given above, the fact that the copy shop does not choose the content simply means that its culpability will be assessed using secondary-liability rules rather than direct-liability rules. [citations].

13

*See ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 454-56 (2014) (Scalia, J. dissenting).

14
15
16
17
18
19
20
21
22
23
24

Like the Netflix example provided by Justice Scalia, 4Internet plays a critical role in selecting, coordinating, and arranging the content that is presented to user who perform a search query on one of its websites. The 4Search network operated by 4Internet is premised on the utilization of "affinity types" which allows users to receive a set of targeted search results based on topics of interest. SSUF Nos. 13-14. This targeted search functionality begins with "seed points" which are domains preselected by 4Internet based on their relevance to a specific affinity type and that act as a starting point for a particular search conducted on one of the websites in the 4Search network. SSUF No. 15. Web crawlers start at these seed points and compile information deemed relevant into an "index" controlled by 4Internet where it remains until queried by a user. SSUF Nos. 16-17.

25
26
27
28

After a query is entered into one of the domains in the 4Search network, a web page is generated based on specifications provided by 4Internet which tells the index which information to use to populate the page and how to compile that information to display through a user's browser. For example, 4Internet can set a limit to the

**MOTION FOR SUMMARY JUDGMENT**

amount of text that populates from the index or can cause indexed photographs to be displayed or completely blocked on the page that is generated. SSUF No. 18.

Here 4Internet engaged in volitional conduct by purposefully curating the "seed points" for 4Jewish and 4Rightwing and by further determining what information from the 4Internet index is presented to users who make a query. In that sense, 4Internet acts as a "gatekeeper," determining precisely the type of content that its users can be exposed to and how that content is ultimately presented.

With respect to Miller's Goat Photograph, once the content from Post's RSS feed was placed in the 4Internet index and queried by a user, 4Internet determined that the Goat Photograph should be prominently displayed via an inline link above text from the Post Article and presented to the user in response to their query. *See* SSUF Nos. 32-34. Indeed, at that time, 4Internet was actively tinkering with appearance and functionality of its webpages in order to try figure out what users would respond to which resulted in numerous changes that occurred day to day, hour by hour, or sometime even click by click. SSUF No. 38.

Thus, 4Internet can be said to have engaged in volitional conduct when it instructed the Goat Photograph to be publicly displayed on 4Jewish and 4RightWing in response to a user query. These unauthorized acts violated Miller's exclusive right to publicly display the Goat Photograph. *See* 17. U.S.C. § 106(5).

Thus, 4Internet has directly infringed the Goat Photograph by violating Miller's exclusive right to display, and summary judgment should be granted.

### a. **4Internet's use of an inline link violates Miller's exclusive right to display the Goat Photograph.**

As described above, 4Internet did not make a direct copy of the Goat Photograph on to its server, but instead displayed the Goat Photograph via an inline link directly from the Post's website. SSUF No. 32.

Miller anticipates that 4Internet will argue that its use of inline linking will absolve 4Internet from infringement since a copy of the Goat Photograph itself does

1   not actually reside on a 4Internet controlled server. However, recent case law has

2   affirmatively held that the use of embedded content hosted on third party servers still

3   runs afoul of a copyright holder's exclusive display rights through the use of inline

4   links.[1] The court in *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585,

5   587 (S.D.N.Y. 2018) provided the following explanation of the practice, which it

6   referred to as "embedding":

7   
8   > A webpage is made up of a series of instructions usually written by coders in
   > Hypertext Markup Language ("HTML"). These instructions are saved to a
9   > server (a computer connected to the internet), and when a user wishes to view a
   > webpage, his or her computer's browser connects with the server, at which point
10  > the HTML code previously written by the coder instructs the browser on how to
   > arrange the webpage on the user's computer. The HTML code can allow for the
11  > arrangement of text and/or images on a page and can also include photographs.
   > When including a photograph on a web page, the HTML code instructs the
12  > browser how and where to place the photograph. Importantly for this case, the
   > HTML code could instruct the browser either to retrieve the photograph from
   > the webpage's own server or to retrieve it from a third-party server.

13  > "Embedding" an image on a webpage is the act of a coder intentionally adding a
   > specific "embed" code to the HTML instructions that incorporates an image,
14  > hosted on a third-party server, onto a webpage. To embed an image, the coder or
   > web designer would add an "embed code" to the HTML instructions; this code
15  > directs the browser to the third-party server to retrieve the image. An embedded
   > image will then hyperlink (that is, create a link from one place in a hypertext
16  > document to another in a different document) to the third-party website. The
   > result: a seamlessly integrated webpage, a mix of text and images, although the
17  > underlying images may be hosted in varying locations. Most social media
   > sites—Facebook, Twitter, and YouTube, for example—provide code that coders
18  > and web designers can easily copy in order to enable embedding on their own
   > webpages.

19  
20  *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018).

21      Nowhere does the Copyright Act suggest that physical possession of an image

    is necessary in order to display it or violate the display right. *Id.* at 593. Indeed, the
22

23  purpose and language of the Act support the opposite view. *Ibid.* The definitions in §

24  101 are illuminating. First, to display a work publicly means to "to transmit . . . a . . .

25  display of the work . . . by means of *any device or process*." 17 U.S.C. §

26  ---
   [1]  The terms "inline linking", "embedding" and "framing" are used somewhat
27  interchangeable in the case law to describe this practice although the true definitions denote
   slightly differing technical processes. *See* https://www.nolo.com/legal-encyclopedia/linking-
   framing-inlining-30090.html (last visited Nov. 1, 2021). For the purposes of this Motion,
28  Miller will refer to the practice as "inline linking" which, in counsel's opinion, appears to be
   the most accurate description of the technical process at issue in this case.

101(emphasis added). To transmit a display is to "communicate it by *any device or process* whereby images or sounds are received beyond the place from which they are sent." *Ibid.* (emphasis added). Devices and processes are further defined to mean ones "now known or later developed." *Ibid.* This is plainly drafted with the intent to sweep broadly. *Goldman*, 302 F. Supp. 3d at 593.

Likewise, other courts to have considered the issue have found the practice of "inline linking" of photographs to constitute actionable copyright infringement. *See Goldman,* 302 F. Supp. 3d at 590-93 (discussing cases and concluding that on the facts at bar, "when defendants caused the embedded Tweets to appear on their websites, their actions violated plaintiff's exclusive display right."); *The Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) (by "framing the defendant's copyrighted works, the plaintiffs impermissibly displayed the works to the public."); *see also Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019).

Regardless of the technological processes at play, it is abundantly clear that 4Internet is liable for causing the Goat Photograph to be publicly displayed on 4Jewish and 4RightWing in violation of Miller's exclusive right to publicly display.

### *3.    4Internet Is Also Vicariously Liable For Infringement.*

Vicarious liability "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, n.9 (2005); *see also Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) ("A defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from *another's* infringing activity and 'has the right and ability to supervise' the infringing activity") (emphasis in original) *see also Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-64 (9th Cir. 1996).

As to the first prong of establishing vicarious liability, it is undisputed that

13

4Internet has the ability to supervise and control the content on 4Jewish and 4RightWing by determining precisely the type of content that its users can be exposed to when querying the 4Interne index and how that content is ultimately presented. *See* SSUF Nos. 15-18. Therefore, the first prong is established.

The second prong considers whether a defendant has a financial interest in the infringing activity. Financial benefit exists where the availability of infringing material "acts as a 'draw' for customers." *Fonovisa*, 76 F.3d at 263-64 (stating that financial benefit may be shown "where infringing performances enhance the attractiveness of a venue").

Here the second prong of vicarious liability is satisfied. 4Internet is in the business of, among other things, domain sales. SSUF No. 11. 4Internet was also interested in actively developing the appearance and functionality of its webpages in order to try figure out what users would respond too, which included incorporating photographs such as the Goat Photograph. *See* SSUF Nos. 38-40. In other word, 4Internet clearly understood that incorporating photographs such as the Goat Photograph into the functionality and design of its websites would lead to a better user experience thus acting as a draw to users and increasing the value of the domains.

Thus,  Miller has established that 4Internet is vicariously liable.

**B.     Miller Can Seek Statutory Damages And Attorneys' Fees.**

Miller is also entitled to summary judgment that he is eligible to pursue statutory damages and attorneys' fees. 17 U.S.C. § 412(2) provides that "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."

Here the Goat Photograph was first published on August 9, 2018. SSUF No. 25. Miller subsequently registered the Goat Photograph on September 25, 2018.

SSUF No. 26. Because the Goat Photograph was registered within three months of first publication, Miller is entitled to seek statutory damages and attorneys' fees/

Thus, summary judgment may properly be entered.

## IV.   4INTERNET'S AFFIRMATIVE DEFENSES MUST FAIL

### A.   Miller Has Sufficiently Stated A Claim

4Internet's First Affirmative Defense is "Failure to State A Claim." As stated in section III.A, *supra*, Miller has validly stated a claim for infringement.

### B.   Miller's Goat Photograph Is Sufficiently Creative

4Internet's Second Affirmative Defense is that Miller's Goat Photograph lacks the constitutionally required minimal degree of creativity. As stated in section III.A.1, *supra*, the Goat Photograph is sufficiently original to be copyrightable.

### C.   4Internet's Conduct Was Not A Fair Use

The Copyright Act lists four factors non-exclusive factors that a court must weigh when determining whether a use is fair: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

As the Ninth Circuit opined "the label 'search engine' is not a talismanic term that serves as an on-off switch as to fair use," rather a court must be cognizant of "the importance of considering the details and function of a website's operation in making a fair use determination." *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th Cir. 2019).

In this case, all four factors weigh heavily against a finding of fair use.

#### 1.   *The Purpose And Character Of The Use Weighs Against A Finding Of Fair Use.*

The first factor directs courts to look specifically at the use made of the copyrighted work to determine whether it qualifies for fair use. *See* 17 U.S.C. § 107.

15

**MOTION FOR SUMMARY JUDGMENT**

1    In interpreting the "purpose and character" of the use, courts look at whether the

2    work was transformative, and whether the use was for commercial purposes. *See*

3    *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 579, (1994).

4         Commercial use is an important consideration in the first fair use factor, and a

5    profit motivation may weigh heavily against fair use. *See Harper & Row Publishers,*

6    *Inc v. Nation Enterprises*, 471 U.S. 539, 562 (1985) (explaining that even straight

7    reporting may, in some cases, be "commercial" for purposes of this factor). The crux

8    of the profit/nonprofit distinction is not whether the sole motive of the use is

9    monetary gain, but whether the user stands to profit from exploitation of the

10   copyrighted material without paying the customary price. *Ibid*.

11        In this case, 4Internet is clearly a for-profit company that intends to generate

12   revenue. *See* SSUF No. 11. Additionally, 4Internet's use of the Goat Photograph

13   cannot be considered "transformative" because 4Internet concededly does not claim

14   to have altered the Goat Photograph in any way. SSUF No. 32. Nor does 4Internet's

15   utilize the Goat Photograph in a "new context." Indeed, the Goat Photograph is

16   simply reproduced over verbatim copied text from the original Post Article. *See*

17   SSUF Nos. 29, 32, and 34; see also *Otto v. Hearst Comms., Inc*., 345 F. Supp. 3d

18   412, 428 (S.D.N.Y. 2018) ("Stealing a copyrighted photograph to illustrate a news

19   article, without adding new understanding or meaning to the work, does not

20   transform its purpose—regardless of whether that photograph was created for

21   commercial or personal use.").

22        Finally, 4Internet's use of the Goat Photograph does not meaningfully affect

23   the functionality of its search technology. Indeed, the use of the Goat Photograph

24   seems wholly gratuitous which renders its usage less likely to be fair.

25        Thus, the first factor weight against fair use.

26        **2.    The Nature Of The Copyrighted Work Weighs Against A**
        **Finding Of Fair Use.**

27

28   The second factor considers "the nature of the copyrighted work." In so doing,

16

1  the court may consider, among other things, whether the work was creative,
2  imaginative, and original, . . . and whether it represented a substantial investment of
3  time and labor made in anticipation of financial return. *Pro Arts, Inc. v. Hustler*
4  *Magazine, Inc*. 787 F.2d 592 (6th Cir. 1986) (quotation omitted). Photographs are
5  generally viewed as creative, aesthetic expressions of a scene or image and have
6  long been the subject of copyright. *See* 17 U.S.C. § 102(a)(5) (extending copyright
7  protection to "pictorial, graphic, and sculptural works"). The Goat Photograph is
8  clearly subject to protectable copyright. *Ibid*.

9      Thus, the nature of the Images weighs against a finding of fair use.

10      ### 3.  *The Amount And Substantiality Of The Portions Used Weighs Against A Finding Of Fair Use.*
11

12      The third fair use factor directs courts to examine the amount and
13  substantiality of the portion used in relation to the copyrighted work as a whole. *See*
14  *Sheldon v. Metro-Goldwyn Pictures Corp*., 471 U.S. 539, 565 (1985) ("no plagiarist
    can excuse the wrong by showing how much of his work he did not pirate").
15

16      In the case at hand, 4Internet did not just use a portion of the Goat
17  Photograph, rather it used the entire work. In fact, 4Internet expressly stated that it
18  needed to use a full-size version of the Goat Photograph rather than a thumbnail
19  because thumbnail images were too small and too low quality for 4Internet's
    purposes. SSUF No. 33.
20

21      Since the 4Internet used the entirety of the Goat Photograph the third factor
22  weighs against the application of fair use.

23      ### 4.  *The Effect On The Market Place Weighs Against Fair Use.*

24      Notably the four factor looks to the effect of the use upon the *potential* market
25  for or value of the copyrighted work. *Monge v. Maya Magazines, Inc.,* 688 F.3d
26  1164, 1181 (9th Cir. 2012) (Recognizing that fair use focuses on potential, not just
    actual, market harm).
27

28      Here, Miller business depends on his ability to convince publications to pay a

**MOTION FOR SUMMARY JUDGMENT**

1    licensing fee to use his photographs. SSUF No. 9. Miller's arrangement with the
2    Post allows him opportunities to license his photographs to third parties. SSUF No.
3    7. However, unauthorized use of Miller's photographs has led to a rapid decline in
4    the number of paid licenses and impacts the overall value of his photographs by
5    diminishing exclusivity and causing Miller to have to devote significant amounts of
6    time and money to detecting and pursuing infringements. SSUF No. 10.

7         4Internet seems to think that it is exempt from licensing content because it
8    allegedly operates a "search engine." However, nobility of the user's purpose does
9    not widen the scope of fair use. *Sadowski v. BackChina* 2018 U.S. Dist. LEXIS
10   120875 at *4 (S.D. Tex. July 16, 2018). Indeed, the fact that 4Internet's use of the
11   Goat photograph was wholly gratuitous only exacerbates the problem further by
12   significantly increasing the potential for downstream infringement. As such, the
13   fourth factor weights against a finding of fair use.

14        In conclusion, the statutory factors weight heavily against a finding of fair use.

15        **D.    4Internet Cannot Prove Unclean Hands**

16        4Internet's Fourth Affirmative Defense is that Miller's alleged "practice of
17   taking photographs of no actual value, for which there is no market, and seeding
18   them on for the purpose of generating revenue through copyright infringement,
19   Plaintiff's claims for equitable relief are barred by unclean hands."

20        "To establish unclean hands, a defendant must demonstrate (1) inequitable
21   conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim
22   which it has asserted against the defendant; and (3) plaintiff's conduct injured the
23   defendant." *Survivor Prods. LLC v. Fox Broad Co.*, 2001 WL 35829270, at *3
24   (C.D. Cal. June 12, 2001).

25        4Internet has offered no evidence of fraud or abuse of process to support the
26   affirmative defense for unclean hands. Furthermore, to the extent 4Internet intends
27   to rely on *other* lawsuits filed by Miller, that cannot act as a basis for unclean hands
28   since the inequitable conduct must directly relate to the claim asserted. 4Internet

18

**MOTION FOR SUMMARY JUDGMENT**

1   has not show that Miller has engaged in any inequitable conduct with respect to the

2   underlying matters in this case. In any event, "the filing of a lawsuit cannot itself

3   form the basis of an unclean hands defense." *Gen-Prob, Inc. v. Amoco Corp*., 926

4   F. Supp. 948, 952 (S.D. Cal. 1997).

5         Thus, summary judgment is appropriate.

6         **E.     4Internet Does Not Have An Implied License**

7         For its Sixth[2] Affirmative Defense 4Internet alleges that "[b]y placing

8   photographs of no real value, for which there is no market, on the [I]nternet, without

9   providing any copyright notice in the photograph's metadata, Plaintiff has granted an

10  implied revocable license for the use of such photographs."

11        This defense fails for numerous reasons. First, the Berne Convention

12  Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853 (1988), eliminated

13  any notice requirement completely. Thus, while the current statute states that "a

14  notice of copyright ... *may* be placed on publicly distributed copies," 17 U.S.C. §

15  401(a) (emphasis added), affixing notice is no longer mandatory for works first

16  published after March 1, 1989. *See Innovative Networks, Inc. v. Satellite Airlines*

17  *Ticketing Centers, Inc.* 871 F.Supp. 709, 720 (S.D.N.Y. 1995).

18        Second, the mere fact that a copyrighted work is published on the Internet is

19  not in and of itself sufficient to show that the author has provided an unrestricted

20  implied license. *See e.g. Veeck v. S. Bldg. Code Cong. Int'l Inc*., 241 F.3d 398, 409

21  (5th Cir. 2001) (Observing that "countless entities provide free access to materials

22  on the Internet and still retain enforcement of their copyrights."[quotation

23  omitted]); *see also Thornton v. J Jargon Co*., 580 F. Supp. 2d 1261, 1281-82 (M.D.

24  Fla. 2008) ("Defendants provide no authority for the proposition that the posting of

25  the BBQE on Plaintiff's website granted an implied license to all [I]nternet users or

26  that the work thereby entered the 'public domain.'"). Indeed, in order to exploit

27

28  [2] 4Internet's Fifth Affirmative Defense was stricken by consent.

**MOTION FOR SUMMARY JUDGMENT**

1   many of the exclusive rights of copyright, the copyright holder is required to

2   disseminate the work publically in some manner. *See* 17 U.S.C. § 106(3)(exclusive

3   right to distribute); (4)(exclusive right to publically perform); (5)(exclusive right to

4   publically display).

5       Finally, the Ninth Circuit has held that an implied license has been granted

6   when the following three elements are satisfied: "(1) a person (the licensee) requests

7   the creation of a work, (2) the creator (the licensor) makes that particular work and

8   delivers it to the licensee who requested it, and (3) the licensor intends that the

9   licensee-requestor copy and distribute his work." *Asset Marketing Systems, Inc v.*

10  *Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008). Here, it is not disputed that the Post, and

11  not 4Internet, requested the creation of the Goat Photograph. SSUF Nos. 19-25.

12      Thus, 4Internet cannot meet the requirements of an implied license and

13  summary judgment should be entered in favor of Miller.

14      **F.    4Internet Does Not Have A License From Twitter**

15      4Internet's Seventh Affirmative Defense states that "The New York Post

16  placed the subject image on Twitter®. In so doing, the terms and conditions found at

17  https://twitter.com/en/tos provide that the license granted to Twitter 'authorizes us to

18  make your Content available to the rest of the world *and to let others do the same*

19  (emphasis added). [sic] Plaintiff's claims are therefore barred by express license."

20      This affirmative defense fails for numerous reasons. First, it is undisputed that

21  4Internet pulled the Goat Photograph from the Post's RSS feed and not from

22  Twitter. SSUF Nos. 29-30. 4Internet fails to explain how or why the Twitter terms

23  of service would govern for photographs not obtained from the Twitter platform.

24  Indeed, the Post's terms of service which *do* govern the use of its services, including

25  its RSS feed, and explicitly prohibits the third party use of its content without prior,

26  written consent, which 4Internet concededly failed to obtain. SSUF Nos. 31, 35.

27      Second, to the extent that the Twitter terms of service would govern, the

28  quoted section by 4Internet merely states that Twitter and others are authorized to

20

**MOTION FOR SUMMARY JUDGMENT**

"make your Content available." This phrase is, at best, ambiguous, and does not explicitly state that an unlimited license is being created. Indeed, just because Twitter or its users might be authorized to make certain content "available" through the Twitter platform does not imply that anyone has a license to use the content in any manner whatsoever.

Finally, Court's to have considered similar arguments have found that the Twitter terms of service do not confer a broad license. *See Agence Fr. Presse v. Morel* , 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011) (interpreting Twitter terms of service); *Agence Fr. Presse v. Morel* , 934 F. Supp. 2d 547, 559 (S.D.N.Y. 2013).

Thus, summary judgment should be entered in favor of Miller.

### G.    Miller's Goat Photograph Is Sufficiently Original

4Internet's Eight Affirmative Defense is that Miller's Goat Photograph "sufficient originality such that it does not qualify for registration under 17 U.S.C. § 102." As stated in section III.A.1, *supra*, the Goat Photograph is sufficiently original to be copyrightable. Additionally, the Goat Photograph was accepted as copyrightable by the Register of Copyrights, which issued Miller registration number VA 2-120-723. SSUF Nos. 26-27.

### H.    4Internet's DMCA Defense Is Factually Inaccurate.

4Internet's Ninth Affirmative Defense contends that 4Internet is protected by the safe harbor provision of 17 U.S.C. § 512(a) and (b).

The Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, established four safe harbors to provide protection from liability for copyright infringement. *Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc*., 853 F.3d 1020, 1027 (9th Cir. 2017). Section 512(a) provides safe harbor for service providers who act as conduits for infringing content. *Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 764-65 (9th Cir. 2007). As described the by the *CCBill* court:

> When an individual clicks on an Internet link, his computer sends a request for the information. The company receiving that request sends that request on to another computer, which sends it on to another. After a series of such

21

**MOTION FOR SUMMARY JUDGMENT**

1
2
3

transmissions, the request arrives at the computer that stores the information. The requested information is then returned in milliseconds, not necessarily along the same path. In passing the information along, each intervening computer makes a short-lived copy of the data. A short time later, the information is displayed on the user's computer.

4
5
6

Those intervening computers provide transient connections among users. The Internet as we know it simply cannot exist if those intervening computers must block indirectly infringing content. We read § 512(a)'s grant of immunity exactly as it is written: Service providers are immune for transmitting all digital online communications, not just those that directly infringe.

7

*Perfect 10, Inc. v. CCBill* LLC, 481 F.3d 751, 765 (9th Cir. 2007)

8
9
10
11
12

Here, it is not disputed that 4Internet did not actually make a copy of the Goat Photograph, but merely caused it to be displayed via an inline link from the Post's server. SSUF No. 32. Thus, 17 U.S.C. § 512(a) which protects service providers from making potentially infringing "short-lived cop[ies] of the data" cannot apply to 4Internet who is not accused of transmitting any infringing data at all.

13
14
15
16
17
18
19
20
21
22

Furthermore, the basis of Miller's infringement claim has nothing to do with transmission of content as described by the *CCBill* court. Rather, it has to do with the display of the Goat Photograph on 4Jewish and 4RightWing. Thus, to the extent any protected "transmitting" is at issue, it does not form the factual basis for Miller;s infringement claim. *See CCBill LLC*, 481 F.3d at 766 ("Even if the hyperlink provided by CCBill could be viewed as an 'information location tool,' the majority of CCBill's functions would remain outside of the safe harbor of § 512(d) . . . Perfect 10 does not claim that CCBill infringed its copyrights by providing a hyperlink; rather, Perfect 10 alleges infringement through CCBill's performance of other business services for these websites.").

23
24
25
26
27
28

Similarly, the section 512(b) safe harbor limits liability of service providers who make "intermediate and temporary storage" of copyrighted material stored in a cache. 17 U.S.C. § 512(b). Again, it is not disputed that 4Internet did not actually make a copy of the Goat Photograph, but merely caused it to be displayed via an inline link from the Post's server. SSUF No. 32. Thus, 512(b) applies to caching cannot apply to 4Internet who is not accused of placing a copy of the Goat

**MOTION FOR SUMMARY JUDGMENT**

1   Photograph into a cache.

2       Furthermore, the basis of Miller's infringement claim has nothing to do with

3   storage of any content in a cache. Rather, it has to do with the display of the Goat

4   Photograph on 4Jewish and 4RightWing.

5       Thus, summary judgment should be entered in favor of Miller.

6   **I. 4Internet's Constitutional Challenge Is Nonsensical**

7       4Internet's final affirmative defense challenges the constitutionality of 17

8   U.S.C. §§ 102 and 410 as applied to photographs.

9       As 4Internet acknowledges, American copyright law has its origins directly in

10  the text of the Constitution itself which specifically enumerates to Congress the

11  broad apower "[t]o promote the Progress of Science and useful Arts, by securing for

12  limited Times to Authors and Inventors the exclusive Right to their respective

13  Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8; *see also* 1 Patry on

14  Copyright § 1:18 (setting forth the history of the copyright clause and its origins at

15  the Constitutional Convention in 1787). Since its adoption, Congress has repeatedly

16  chosen to exercise its Constitutional authority through copyright related legislation,

17  the most recent of which is the Copyright Act of 1976. *See* 17 U.S.C. §§ 101 et seq.

18      In essence, 4Internet is asking this Court to declare that Congressional

19  Because Congressional power to legislate on matters of copyright is rooted in the

20  text of the Constitution itself, 4Internets argument would have this Court declare

21  Article I, section 8, clause 8 to itself be unconstitutional. Since it would defy

22  common sense to declare the Constitution itself unconstitutional. 4Internet's

23  argument must fail.

24      Finally, previous constitutional challenges to copyright have been

25  unsuccessful. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S.

26  539, 568 (1985) (rejecting First Amendment challenge to copyright infringement

27  action); *see also Zacchini v. Scripps-Howard*, 433 U.S. 562, 574-78 (1977).

28      Thus, summary judgment should be entered in favor of Miller.

**MOTION FOR SUMMARY JUDGMENT**

**V.    CONCLUSION**

In conclusion, Plaintiff Robert Miller respectfully requests that summary judgment be entered in his favor and against Defendant 4Internet, LLC.

DATED: November 1, 2021                    Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile
*Counsel for Plaintiff*

24
**MOTION FOR SUMMARY JUDGMENT**

**PROOF OF SERVICE**

I, the undersigned, say:


I am a citizen of the United States, am over the age of 18 and not a party to the within action. My business address is 2445 Fire Mesa St., Suite 150, Las Vegas, NV 89128.

On November 1, 2021 I caused to be served the foregoing documents:

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; DECLARATION OF RYAN E. CARRREON; DECLARATION OF ROBERT MILLER; DECLARATION OF EUGENE SADOWSKI; SEPARATE STATEMENT OF UNDISPUTED FACTS; INDEX OF EXHIBITS AND EVIDENCE**

X      I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court, District of Nevada using the CM/ECF system which will send notice of such filing to the following registered CM/ECF users:

Ryan Isenberg ryan@ihlaw.us


I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on November 1, 2021 at Wilmington, Delaware.

*/s/ Ryan E. Carreon*
Ryan E. Carreon

**MOTION FOR SUMMARY JUDGMENT**