1  Mathew K. Higbee, Esq., SBN 11158
   Ryan E. Carreon, *pro hac vice*
2  **HIGBEE & ASSOCIATES**
   2445 Fire Mesa St., Suite 150
3  Las Vegas, NV 89128
   (714) 617-8373
4  (714) 597-6729 facsimile
   Email: mhigbee@higbeeassociates.com
5  rcarreon@higbeeassociates.com

6  Attorney for Plaintiff,
   ROBERT MILLER

7              **UNITED STATES DISTRICT COURT**
                  **DISTRICT OF NEVADA**
8                 **LAS VEGAS DIVISION**

9  ROBERT MILLER,                    Case No. 2:18-cv-02097-JAD-VCF

10              Plaintiff,           **OPPOSITION TO DEFENDANT**
                                     **4INTERNET'S MOTION FOR**
11 v.                                **SUMMARY JUDGMENT**

12 4INTERNET, LLC; and DOES 1 through
   10 inclusive,
13
                Defendants.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................ 1

II.    LEGAL STANDARD ................................................................. 1

    A.    Summary Judgment Standard ............................................. 1

III.   MILLER OWNS A VALID COPYRIGHT IN THE GOAT PHOTO .......... 1

    A.    Miller Has Established *Prima Facie* Copyright Infringement. ............ 1

        1.    4Internet's "Deposit Copy" Argument Is A Red Herring. ......... 1

        2.    Miller's Goat Photograph Is Sufficiently Original To Qualify For Copyright Protection.................................. 3

    B.    Miller Has Standing To Pursue This Claim......................... 5

IV.    4INTERNET VIOLATED MILLERS EXCLSUIVE DISPLAY RIGHT .......................................................................... 7

    A.    The "Server Test" Is Inconsistent With The Copyright Act's Text. .................................................................. 9

    B.    The "Server Test" Is Inconsistent With The Holding In *Aereo*. ......... 13

V.     THE GOAT PHOTOGRAPH WAS NOT CACHED ................................ 14

VI.    4INTERNET'S USE WAS NOT A FAIR USE .................................... 14

    A.    The Purpose And Character Of The Use Weighs Against Fair Use. ................................................................ 15

    B.    The Nature Of The Copyrighted Work Weighs Against Fair Use. ................................................................ 16

    C.    The Substantiality Of The Portion Used Weighs Against Fair Use. ................................................................ 16

    D.    The Effect On The Market Place Weighs Against Fair Use.............. 17

VII.   4INTERNET IS NOT PROTECTED BY THE DMCA .............................. 18

VIII.  4INTERNET DID NOT HAVE AN EXPRESS OR IMPLIED LICENSE ....................................................................... 19

IX.    4INTERNET CONSTITUTIONAL CHALLENGE IS NONSENSICAL ..................................................................... 21

X.     CONCLUSION ......................................................................... 22

1

## <u>TABLE OF AUTHORITIES</u>

2

## <u>CASES</u>

3

4

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)....................................................................................................... 1

5

*American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014) .................... 9, 13

6

*Asset Marketing Systems, Inc v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008)............................................................................................................ 19

7

*Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065 (9th Cir. 2021)....................... 7

8

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, (1994) ........................... 15

9

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)................................................ 1

10

*Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1077 (9th Cir. 2000)...................... 4

11

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) ....................... 1

12

*Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115–16 (D. Nev. 2006) .................. 20

13

14

*Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019)........................................................................................................ 12

15

*Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) .................................................................................................. 1

16

17

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018)........................................................................................... 9

18

*Goodman v. Universal Beauty Prods.*, 2018 U.S. Dist. LEXIS 39176, at *12 (S.D.N.Y. Mar. 9, 2018)................................................................... 2

19

20

*Hard Rock Cafe Int'l (USA) Inc. v. Morton*, 1999 U.S. Dist. LEXIS 8340, 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999) ..................................... 11

21

*Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc.*, 853 F.3d 1020, 1027 (9th Cir. 2017) ....................................................................... 18

22

23

*Midlevelu, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1217 (11th Cir. 2021)....................................................................................................... 21

24

*Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1181 (9th Cir. 2012) ................ 17

25

*Nicklen v. Sinclair Broadcast Group, Inc., et al.,* 2021 WL 3239510 (S.D.N.Y. July 30, 2021)........................................................................... 12

26

27

*Nintendo of America, Inc. v. Dragon Pacific Intern.*, 40 F.3d 1007, 1012 (9th Cir. 1994)................................................................................... 7

28

*On Davis v. The Gap, Inc.*, 246 F.3d 152, 158 (2d Cir. 2001).................................. 6

*Otto v. Hearst Comms., Inc.*, 345 F. Supp.3d 412, 428 (S.D.N.Y.

iii

2018)......................................................................................................... 16

*Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006)................... 8

*Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146 (9th Cir. 2007)...................... 8

*Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 764-65 (9th Cir. 2007)............. 18, 19

*Pro Arts, Inc. v. Hustler Magazine, Inc*. 787 F.2d 592 (6th Cir. 1986) ................. 16

*S.O.S., Inc. v. Payday, Inc*., 886 F.2d 1081, 1085 n.3 (9th Cir.1989)...................... 1

*Sadowski v. BackChina* 2018 U.S. Dist. LEXIS 120875 at *4 (S.D. Tex. July 16, 2018).......................................................................................... 17

*Sheldon v. Metro-Goldwyn Pictures Corp*., 471 U.S. 539, 565 (1985) ................. 16

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)....................................................... 5

*The Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 fWL 5629514 (N.D. Tex. Nov. 22, 2017) ..................................... 11

*Thornton v. J Jargon Co*., 580 F. Supp. 2d 1261, 1281-82 (M.D. Fla. 2008)................................................................................................................. 20

*Veeck v. S. Bldg. Code Cong. Int'l Inc*., 241 F.3d 398, 409 (5th Cir. 2001)................................................................................................................. 20

*VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th Cir. 2019)................... 12, 15

*Zacchini v. Scripps-Howard*, 433 U.S. 562, 574-78 (1977)................................... 22

**STATUTES**

17 U.S.C. § 101 ...................................................................................................... 10

17 U.S.C. § 102(a)(5) ........................................................................................ 4, 22

17 U.S.C. § 106 ........................................................................................................ 1

17 U.S.C. § 106(3) ................................................................................................. 20

17 U.S.C. § 106(5) ................................................................................................... 9

17 U.S.C. § 107 ................................................................................................ 14, 15

17 U.S.C. 407(b) ...................................................................................................... 2

17 U.S.C. § 410(c)................................................................................................ 1, 3

17 U.S.C. § 512(a) ................................................................................................. 18

17 U.S.C. § 512(b) ................................................................................................. 19

37 C.F.R. § 202.4(i)................................................................................................. 2

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Robert Miller ("Miller") respectfully submits this Opposition to Defendant 4Internet's ("4Internet") Motion for Summary Judgment.

## II.   LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings and the evidence demonstrate "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.   MILLER OWNS A VALID COPYRIGHT IN THE GOAT PHOTO

### A. Miller Has Established *Prima Facie* Copyright Infringement.

To establish a prima facie case of copyright infringement, a plaintiff "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Funky Films, Inc. v. Time Warner Entm't Co*., 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991)). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights" under 17 U.S.C. § 106. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (quotation omitted)). These exclusive rights include the right to reproduce, distribute, publicly display, perform, or create derivative works of the copyrighted work. *See* 17 U.S.C. § 106.

### 1.   4Internet's "Deposit Copy" Argument Is A Red Herring.

A certificate of registration validly obtained from the Copyright Office within five years of first publication of a work constitutes *prima facie* evidence of the originality of the work and of the facts stated therein, including ownership. *See* 17 U.S.C. § 410(c).

Miller's Goat Photograph was originally published on August 9, 2018. Miller's Separate Statement of Undisputed Facts filed at Dkt. 97-1 ("Miller SSUF") No. 25. Miller subsequently registered the Goat Photograph on September 25, 2018 as part of a group registration[1] of photographs and was issued registration certificate VA 2-120-723. Miller SSUF No. 26. Because registration was made within five years of publication, Miller is entitled to the statutory presumption that his Goat Photograph was properly registered.

4Internet attempts to cast doubt on the propriety of Miller's copyright registration by arguing that Miller has not presented any evidence to show that the Goat Photograph at issue was registered as part of certificate VA 2-120-723. 4Internet's argument is premised, in part, on a misunderstanding of how deposit copies are submitted to the United States Copyright Office.

Once the materials are submitted, the copyright holder is issued a payment receipt and the physical deposit copies remain at the Library of Congress indefinitely. *See* 17 U.S.C. § 407(b) ("The required copies or phonorecords shall be deposited in the Copyright Office *for the use or disposition of the Library of Congress*. [Emphasis added].).

In response to a discovery request, Miller provided 4Internet with a raw jpeg of the Goat Photograph that was submitted for registration. Second Declaration of Ryan E. Carreon ("Second Carreon Decl.") ¶14. To the extent that 4Internet doubted the propriety of the discovery, 4Internet had ample opportunity to request a certified copy of the deposit directly from the Copyright Office but choose not to do so. *See Goodman v. Universal Beauty Prods.*, 2018 U.S. Dist. LEXIS 39176, at *12 (S.D.N.Y. Mar. 9, 2018) ("defendants argue that the certificate submitted by plaintiff does not 'prove' that it relates to the Photograph at issue here ... defendants offer

---

[1] Pursuant to 37 C.F.R. § 202.4(i), a group of not more than 750 published photographs can be registered together on a single registration application provided they were all created by the same author and were all originally published in the same calendar year.

nothing more than speculative assertions to support this contention ... defendants had the opportunity to request a certified deposit copy from the U.S. Copyright Office and submit it with their opposition to plaintiff's motion for summary judgment. Their failure to submit any evidence, however, prevents them from raising a triable issue on the validity of the registration."). In addition, 4Internet could also have sought to subpoena Richard Liebowitz, the attorney who certified the submission, but failed to do that as well.

In an effort to make up for its lack of evidence, 4Intenet relies on out of content deposition testimony to argue that Miller "doesn't know what image was copyrighted." Motion a p. 8. However, during the deposition exchange in question Miller stated that he did not understand counsel's use of the term of art "deposit copy" and thus could not answer the question. Miller never stated that he did not know the contents of what was submitted to the United States Copyright Office. *See* Miller's Statement of Genuine Disputes of Material Fact ("SGD") No. 7.

In fact, contrary to 4Internet's assertion, Miller explicitly stated in his declaration that he registered Goat Photograph under VA 2-120-723 and that the file name "is listed on registration certificate VA 2-120-723 as 8.9.18._FRed_the goat_.Miller.jpg." Declaration of Robert Miller filed at 97-3 ("Miller Decl.") ¶36.

Ironically, if 4Internes's argument is to be believed it would create a dispute of material fact that would compel the Court to deny 4Internet's Motion. As the moving party, 4Internet bears the initial burden of production. 4Internet has not presented any evidence *affirmatively showing* that Miller's Goat Photograph is not part of registration VA 2-120-723.

4Internet's Motion must be denied.

### 2.   *Miller's Goat Photograph Is Sufficiently Original To Qualify For Copyright Protection.*

As stated above, Miller is entitled to the statutory presumption that the Goat Photograph is validly copyrightable. *See* 17 U.S.C. § 410(c).

1    Even if not afforded the statutory presumption of originality, the Goat

2  Photograph easily makes the grade. Photographs have long been the subject of

3  copyright. *See* 17 U.S.C. § 102(a)(5) (extending copyright protection to "pictorial,

4  graphic, and sculptural works").

5    4Internet goes into great detail listing all of the decisions that Miller did not

6  make, while ironically quoting to the court in *Ets-Hokin v. Skyy Spirits, Inc.*, 225

7  F.3d 1068, 1077 (9th Cir. 2000) which observed that "perhaps even perspective

8  alone" would be a sufficiently original contribution to render a photograph subject to

9  copyright. The vast majority of 4Internet's argument is dedicated to the supposed

10  minimal amount of *effort* that Miller allegedly expended on creating the goat

11  Photograph, however the Supreme Court in *Feist* specifically renounced the so-

12  called "sweat of the brow" doctrine holding that the amount of effort expended in

13  creating a work is not relevant to the work's ultimate copyrightability. *See Feist*

14  *Publ'ns, Inc.*, 499 U.S. at 352-56. Instead, the *Feist* court observed that the sole

15  inquiry to be considered was whether a work was sufficiently original. *Id.* at 345

16  ("Original, as the term is used in copyright, means only that the work was

17  independently created by the author (as opposed to copied from other works), and

18  that it possesses at least some minimal degree of creativity. [Citation]. To be sure,

19  the requisite level of creativity is extremely low; even a slight amount will suffice.

20  The vast majority of works make the grade quite easily, as they possess some

21  creative spark, no matter how crude, humble or obvious it might be. [Citation and

22  quotation omitted].).

23    Here, Miller creative contributions are far greater than the mere perspective of

24  his shot. For example, Miller took multiple cameras and lenses with him on the

25  assignment, and upon spotting Fred the Goat, made a creative decision to choose the

26  camera and lens that he thought would produce the most compelling photograph

27  based on the circumstances and his, experience. Miller SSUF No. 23. In addition,

28  Miller adjusted the camera settings, used a low ISO setting to minimize grain,

determined the framing and angle of each of the shots, including making the creative decision to capture Fred from the side as opposed to straight on, shot from a perspective to take advantage of the best lighting possible, tried to minimize the visual interference of any background elements, and used his professional skill and experience to determine the precise moment in time to take the photographs ensure that the goat's posture and positioning would create the most visually appealing shot. *Ibid*.

These creative decisions are sufficient to meet the relatively low bar for originality, regardless of the amount of effort involved. *See Feist Publ'ns, Inc.* 499 U.S. at 345 ("To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice."). 4Internet's arguments as to the *amount* of Miller's creativity are more suited to an argue over the value of the Goat Photograph and not to its copyrightability.

Therefore, 4Internet's Motion should be denied.

**B. Miller Has Standing To Pursue This Claim.**

Next, 4Internet makes the confusing argument that Miller does not have standing. 4Internet claims that Miller cannot demonstrate that he has suffered an "injury in fact" because only Eugene Sadowski, employees of Higbee & Associates, and 4Internet actual saw the infringing post. Supporting this proposition 4Internet cites to *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), a case addressing an intervener's Article III standing in a Fair Credit Reporting Act case. However, the *Spokeo* holding does not help 4Internet here.

There, the Court considered a claim against Spokeo, a "people search engine," alleging that when Spokeo trawled online sources to generate a profile of the plaintiff, it collected and reported inaccurate information about him, including his age, education, and marriage and family status, as well as job and socioeconomic position. *Id.* at 1544, 1546. The plaintiff asserted that Spokeo qualified as a "consumer reporting agency" under the Fair Credit Reporting Act ("FCRA").

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1   The Supreme Court concluded that while the *Spokeo* plaintiff could not
2   "allege a bare procedural violation, divorced from any concrete harm, and satisfy the
3   injury-in-fact requirement of Article III," that did "not mean . . . that the *risk* of real
4   harm cannot satisfy the requirement of concreteness." *Id.* at 1549 (emphasis added).
5   After all, as "Congress is well positioned to identify intangible harms that meet
6   minimum Article III requirements, [and] its judgment is also instructive and
7   important," Congress "may 'elevat[e] to the status of legally cognizable injuries
8   concrete, *de facto* injuries that were previously inadequate in law.'" *Ibid.* Thus, the
9   critical question for standing purposes is "whether the particular procedural
10  violations alleged in this case entail *a degree of risk* sufficient to meet the
11  concreteness requirement." *Id.* at 1550. (Emphasis added).

12  The *Spokeo* court also specifically stated that it took "no position as to
13  whether the Ninth Circuit's ultimate conclusion — that Robins adequately alleged
14  an injury in fact — was correct." *Id.* at 1550.

15  Here, contrary to 4Internet's argument that no members of the public actually
16  viewed the infringing webpages, the webpages were in fact viewed by Eugene
17  Sadowski, and employees of Higbee & Associates which resulted in an actual
18  violation of Miller's display right. 4Internet does not explain why these viewers are
19  not considered members of the public, nor does it cite to any authority that the
20  "intent" of the viewer is in anyway relevant to standing.

21  Indeed, the fact that Eugene Sadowski may have been the first to view the
22  infringing webpages, or that 4Internet removed the infringing webpages before they
23  could be viewed again did not allay the risk of potential further harm that could have
24  occurred had the page been viewed by additional members of the public.

25  Regardless, "[t]he existence of damages suffered is not an essential element of
26  a claim for copyright infringement." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 158
27  (2d Cir. 2001), *as amended* (May 15, 2001) (citing *Feist*, 499 U.S. at 361); *see*
28  *also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01, at 13-6

6

1   *159 (1999) ("Notably absent from this formulation of the prima facie case is

2   damage or any harm to [the] plaintiff resulting from the infringement."). The

3   Supreme Court has stated that "[e]ven for uninjurious and unprofitable invasions of

4   copyright the court may, if it deems it just, impose a liability within [the] statutory

5   limits to sanction and vindicate the statutory policy" of discouraging

6   infringement. *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233,

7   (1952); *see also Los Angeles News Service*, 149 F.3d at 996 (no need for evidence of

8   actual damages); *Nintendo of America, Inc. v. Dragon Pacific Intern.*, 40 F.3d 1007,

9   1012 (9th Cir. 1994) (emphasizing punitive and deterrent goals of Copyright Act).

10      Incredibly, 4Internet directly acknowledges the binding Ninth Circuit case

11   *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065 (9th Cir. 2021) which was issued

12   less than three months ago, and which specifically held that "[t]he Copyright Act

13   does not require proof that the protected work was actually viewed by anyone.

14   Rather, the Act defines 'publicly' to merely require that the display be at 'a place

15   *open* to the public.'" (Citation omitted, emphasis in original). Rather than attempt to

16   distinguish *Bell*'s directly-on-point holding, 4Internet merely states that it "takes

17   umbrage" with the decision and then pretends that it never existed.

18      In sum, 4Internet's argument seems to be more about the alleged lack of

19   damages suffered by Miller rather than about whether Miller has standing to pursue

20   a claim of infringement. In any event, 4Internet's Motion for Summary Judgment

21   must be denied.

22   **IV.   4INTERNET VIOLATED MILLERS EXCLSUIVE DISPLAY RIGHT**

23      4Internet contends that its display of the full version of Miller's Goat

24   Photograph on 4Jewish and 4RightWing does not constitute infringement because it

25   did not actually make a copy of the Goat Photograph or upload it to any servers

26   owned or controlled by 4Internet, but instead "in-line linked[2]" the Goat Photograph

27

28   [2]   The terms "inline linking", "embedding" and "framing" are used somewhat interchangeable in the case law to describe this practice although the true definitions denote slightly differing technical processes. *See* https://www.nolo.com/legal-encyclopedia/linking-

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1   directly from the New York Post server. For this proposition, 4Internet relies heavily
2   on the so called "server test" employed in *Perfect 10, Inc. v. Amazon.com, Inc*., 508
3   F.3d 1146 (9th Cir. 2007) ("*Perfect 10 II*").

4        In *Perfect 10, Inc*. the Ninth Circuit considered a claim of direct infringement
5   of the display right against Google based upon Google Image Search. The district
6   court addressed two different questions: 1) did the thumbnail images that
7   automatically pop up when a user types in a search term constitute direct
8   infringements of the display right; and 2) did the full-size images that appeared on
9   the screen after a user clicked on a thumbnail constitute direct infringements of the
10  same display right. In considering a preliminary injunction, the district court made a
11  sharp distinction based upon where the images were hosted. *Perfect 10 v. Google,*
12  *Inc*., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) ("*Perfect 10 I*").

13       First, it found the thumbnails to be infringing, based on the fact that they
14  were stored on Google's server. *Id.* at 844. Conversely, it held that the full-size
15  images, which were stored on third-party servers and accessed by "in-line
16  linking"— which works based upon the HTML code instructions— were not
17  infringements. *Ibid*. It adopted the "server test", where the question of whether a
18  website publisher is directly liable for infringement turns entirely on whether the
19  image is hosted on the publisher's own server, or is embedded or linked from a
20  third-party server.

21       Likewise, 4Iternet argues that it cannot be liable under the "server test"
22  because it did not actually copy or host the Goat Photograph on any of its servers,
23  but rather it "in-line linked" the Goat Photograph from the New York Post server
24  onto its websites which subsequently caused the Goat Photograph to be displayed.

25       Accordingly, whether a website publisher is directly liable for infringement

26

27  framing-inlining-30090.html (last visited Nov. 22, 2021). For the purposes of this
    Opposition, Miller will refer to the practice as "inline linking" which, in counsel's opinion,
28  appears to be the most accurate description of the technical process at issue in this case.

of the display right appears to turn on the technical distinction of whether an image is hosted on the publisher's own server, or is instead visible on the website's visual display from a third-party location even though this technical distinction is invisible[3] to the viewer.

Not only does this argument not comport with the express text of the Copyright Act, but multiple courts have since disavowed the "server test" observing instead that facilitating a public display of a copyrighted work through an in-line link, even if no actual copying occurs, violates the copyright holders exclusive "display" right. *See* 17 U.S.C. § 106(5) (exclusive right to publicly display).

Indeed, the "server test" is inconsistent with the Supreme Court's subsequent holding in *American Broadcasting Cos. v. Aereo, Inc*., 573 U.S. 431 (2014).

## A. The "Server Test" Is Inconsistent With The Copyright Act's Text.

The "server test" is premised on the idea that actual possession of a physical copy of a work is required to display it. However, nowhere does the Copyright Act suggest that possession of an image is necessary in order to display it or violate the display right. *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 593 (S.D.N.Y. 2018). The court in *Goldman* provided the following explanation of the practice, which it referred to as "embedding":

> A webpage is made up of a series of instructions usually written by coders in Hypertext Markup Language ("HTML"). These instructions are saved to a server (a computer connected to the internet), and when a user wishes to view a webpage, his or her computer's browser connects with the server, at which point the HTML code previously written by the coder instructs the browser on how to arrange the webpage on the user's computer. The HTML code can allow for the arrangement of text and/or images on a page and can also include photographs. When including a photograph on a web page, the HTML code instructs the browser how and where to place the photograph. Importantly for this case, the HTML code could instruct the browser either to retrieve the photograph from the webpage's own server or to retrieve it from a third-party server.

---

[3] Despite technological complexity concerning the "behind-the-scenes" delivery of images, a defendant violates the exclusive right to "show [an audiovisual work's] images in any sequence," because "whether Aereo transmits from the same or separate copies, it ... shows the same images and makes audible the same sound." Simply put, to "show a copy" is to display it. *Am. Broad. Companies, Inc. v. Aereo, Inc*., 573 U.S. 431, 441-48 (2014), citing 17 U.S.C. § 101.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

"Embedding" an image on a webpage is the act of a coder intentionally adding a specific "embed" code to the HTML instructions that incorporates an image, hosted on a third-party server, onto a webpage. To embed an image, the coder or web designer would add an "embed code" to the HTML instructions; this code directs the browser to the third-party server to retrieve the image. An embedded image will then hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated webpage, a mix of text and images, although the underlying images may be hosted in varying locations. Most social media sites—Facebook, Twitter, and YouTube, for example—provide code that coders and web designers can easily copy in order to enable embedding on their own webpages.

*Goldman*, 302 F. Supp. at 587.

As *Goldman* held, neither "the text or purpose of the Copyright Act suggest[s] that physical possession of an image is a necessary element to its display for purposes of the Act." *Id.* at 594[4]. Indeed, the purpose and language of the Act support the opposite view. *Ibid.* The definitions in § 101 are illuminating. First, to display a work publicly means to "to transmit . . . a . . . display of the work . . . by means of *any device or process*." 17 U.S.C. § 101 (emphasis added). To transmit a display is to "communicate it by *any device or process* whereby images or sounds are received beyond the place from which they are sent." *Ibid.* (emphasis added). Devices and processes are further defined to mean ones "now known or later developed." *Ibid.* This is plainly drafted with the intent to sweep broadly. *Goldman*, 302 F. Supp. 3d at 593.

Since *Perfect 10*'s holding a number of courts have addressed and declined to adopt the "server test" for violations of the display right. In *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 593 (S.D.N.Y. 2018), the court held that news websites that embedded a "tweet" containing a photograph of NFL quarterback Tom Brady were liable for violation of the photographer's display right, notwithstanding the fact that none of the websites actually hosted the

---

[4]  The *Goldman* reading is consistent with the Supreme Court's admonition that, to determine whether a work is infringed under the Copyright Act, a court must "focus on the [work] as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). For purposes of the display right, then, it is the viewer's experience that matters, not the internal mechanics of how the content is stored or retrieved.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

photograph in question on their servers. The *Goldman* court expressly declined to adopt the "server test" finding that its application was incompatible with the express statutory language of the Copyright Act, which did not require "possession" of a copyrighted work for an infringement to occur.

In *The Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017), at issue on summary judgment was, *inter alia*, whether plaintiffs infringed defendant's exclusive display rights by "framing" defendant's websites. The court rejected *Perfect 10*, holding that by "framing the defendant's copyrighted works, the plaintiffs impermissibly displayed the works to the public." 2017 U.S. Dist. LEXIS 193555, [WL] at *10. It distinguished *Perfect 10* on its facts, noting that, "[U]nlike Google, [plaintiffs' website] did not merely provide a link by which users could access [defendant's] content but instead displayed [defendant's] content as if it were its own." 2017 U.S. Dist. LEXIS 193555, [WL] at *11. It further stated: "[T]o the extent *Perfect 10* makes actual possession of a copy a necessary condition to violating a copyright owner's exclusive right to display the copyrighted works, the Court respectfully disagrees . . . The text of the Copyright Act does not make actual possession of a work a prerequisite for infringement." *Ibid.*

In a trademark decision rendered in the Second Circuit prior to *Perfect 10*, when considering whether defendant Tunes was liable for trademark infringement to the Hard Rock Café for "framing" the Hard Rock logo on their website, the court held that it was. *Hard Rock Cafe Int'l (USA) Inc. v. Morton*, 1999 U.S. Dist. LEXIS 8340, 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999). After considering both the fact that "it [was] not clear to the computer user that she or he has left the [plaintiff's] web site" and the fact that there was a "seamless presentation" on the website, the court found that "the only possible conclusion is that the Hard Rock Hotel Mark is used or exploited to advertise and sell CDS." 1999 U.S. Dist. LEXIS 8340, [WL] at *25.

1    In addition, at least one district court in the Ninth Circuit has expressly
2  declined to apply the "server test" to violations of the display right for photographs
3  displayed via an embedded link. *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d
4  1162, 1172 (N.D. Cal. 2019) ("FSS cites no case applying the *Perfect 10* server test
5  outside of the context of search engines. Indeed, subsequent cases have refused to
6  apply the *Perfect 10* server test outside of that context*."); see also Nicklen v.*
7  *Sinclair Broadcast Group, Inc., et al.,* 2021 WL 3239510 (S.D.N.Y. July 30, 2021).

8    Here, 4Internet attempts to rely on the fact that it is a "search engine" to
9  support the applicability of the "server test" to the infringements at issue. However,
10  the Ninth Circuit opined "the label 'search engine' is not a talismanic term that
11  serves as an on-off switch" rather a court must be cognizant of "the importance of
12  considering the details and function of a website's operation" in making
13  determination of infringement. *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th
14  Cir. 2019).

15    Considering the specifics of *Perfect 10*, the facts of this case are
16  distinguishable. In *Perfect 10*, the full-sized images at issue only appeared "when a
17  user click[ed] on the thumbnail image returned by Google's search engine" via the
18  Google Image Search feature. *Perfect 10 II*, 508 F.3d at 1157. In other words, the
19  Google user was required to "click-through" the thumbnail in order to view the full-
20  sized image.

21    In contrast, the display of the Goat Photograph on 4Jewish and 4Rightwing
22  was not the result of an image search function, nor was it the result of a "click-
23  though" of a thumbnail. Rather, it was 4Internet that decided to display the full-
24  sized Goat Photograph immediately to the viewer upon entering a text query. *See*
25  Miller SSUF No. 18. In fact, unlike Google in *Perfect 10*, 4Internet specifically
26  decided to initially display the Goat Photograph as a full-sized image rather than a
27  thumbnail because thumbnail images were too small and too low quality for
28  4Internet's purposes. *See* Miller SSUF No. 33.

1    Likewise, unlike Google's Image Search function which displayed a list of
2    results to the user, 4Internet simply displayed one single headline, the Goat
3    Photograph, as well as text from the New York Post; 4Internet's results did not
4    return in list form like Google. *See* Miller SSUF No. 34.

5    The *Perfect 10* district court implied that its endorsement of the "server test"
6    was a policy judgment and did not hold that the test was appropriate for every case.
7    In adopting the test, the Court expressly acknowledged that application of the test
8    was "susceptible to extreme or dubious results." *Perfect 10 I*, 415 F. Supp. 2d at
9    839. Thus, the holding of *Perfect 10* should be seen for what it was, a highly fact
10   specific policy driven ruling that sought to sought to balance the utilitarian value of
11   a search engine such as Google to society at large.

12   Therefore, the Court should decline to apply the "server test" in this case.

13   **B. The "Server Test" Is Inconsistent With The Holding In *Aereo*.**

14   The *Perfect 10* decision is not only inconsistent with the plain language of the
15   Copyright Act, and inapplicable to the facts of this case, but it also runs contrary to
16   subsequent Supreme Court authority that rejected the very sort of technical
17   distinctions that underpinned the "server test" in the first instance. For this reason as
18   well, the *Perfect 10* decision should be limited in its reach and not applied here.

19   In *Aereo*, an Internet-based re-transmitter of over-the-air television signals
20   argued that it did not "perform the copyrighted work publicly" because each
21   transmission technically came from a miniature antenna assigned to each user and,
22   therefore, was a "private" rather than "public" performance. *Id.* at 443-46. The Court
23   rejected that argument, noting that the technical difference "means nothing to the
24   subscriber. It means nothing to the broadcaster. We do not see how this single
25   difference, invisible to subscriber and broadcaster alike, could transform a system"
26   from infringing to non-infringing. *Id.* at 444. "Viewed in terms of Congress'
27   regulatory objectives," the Court asked rhetorically, "why should any of these
28   technological differences matter?" *Id.* at 446. *Aereo* therefore provides that it is a

13

1  practical, functional perspective, and not hyper technicalities, that determine whether
2  a particular mode of content delivery is infringing or not.

3      The "server test" that 4Internet champions is wholly inconsistent with *Aereo*.
4  Where a website publisher purposely constructs its website to show a copyrighted
5  photograph as part of that website -- whether through HTML instructions, embed
6  code, or "any other device or process" that has not yet been invented -- it is not only
7  the website publisher's action but ultimately the reasonable viewer's perception that
8  matters, regardless of the physical location of the image being displayed.

9      Thus, 4Internet's Motion for Summary Judgment should be denied.

10  **V.    THE GOAT PHOTOGRAPH WAS NOT CACHED**

11     Next, 4Internet makes an odd argument that the Goat Photograph was
12  allegedly in Eugene Sadowski's cache memory based on a separate infringement of
13  the Goat Photograph he discovered on www.nuttynewstoday.com. However, this
14  argument fails because Eugene Sadowski discovered the www.nuttynewstoday.com
15  infringement *after* the 4Internet infringement. SGD No. 36.

16     Thus, 4Internet's Motion should be denied[5].

17  **VI.    4INTERNET'S USE WAS NOT A FAIR USE**

18     The Copyright Act lists four factors non-exclusive factors that a court must
19  weigh when determining whether a use is fair: (1) the purpose and character of the
20  use, including whether such use is of a commercial nature or is for nonprofit
21  educational purposes; (2) the nature of the copyrighted work; (3) the amount and
22  substantiality of the portion used in relation to the copyrighted work as a whole; and
23  (4) the effect of the use upon the potential market for or value of the copyrighted
24  work. 17 U.S.C. § 107.

25     As the Ninth Circuit opined "the label 'search engine' is not a talismanic term

26

---

27  [5]  4Internet also incorrectlt claims evidence of the www.nuttynewstoday.com
   infringement was spoliated, however as more fully explained in Dkt. #100,
   4Internet neither asked for this information in discovery nor subpoenaed Eugene
28  Sadowski for any documents despite subpoenaing him for a deposition.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    that serves as an on-off switch as to fair use," rather a court must be cognizant of
2    "the importance of considering the details and function of a website's operation in
3    making a fair use determination." *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742
4    (9th Cir. 2019).

5        In this case, all four factors weigh heavily against a finding of fair use.

6        **A.    The Purpose And Character Of The Use Weighs Against Fair Use.**

7        The first factor directs courts to look specifically at the use made of the
8    copyrighted work to determine whether it qualifies for fair use. *See* 17 U.S.C. § 107.
9    In interpreting the "purpose and character" of the use, courts look at whether the
10   work was transformative, and whether the use was for commercial purposes. *See*
11   *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 579, (1994).

12       Commercial use is an important consideration in the first fair use factor, and a
13   profit motivation may weigh heavily against fair use. *See Harper & Row Publishers,*
14   *Inc v. Nation Enterprises*, 471 U.S. 539, 562 (1985) (explaining that even straight
15   reporting may, in some cases, be "commercial" for purposes of this factor). The crux
16   of the profit/nonprofit distinction is not whether the sole motive of the use is
17   monetary gain, but whether the user stands to profit from exploitation of the
18   copyrighted material without paying the customary price. *Ibid*.

19       In this case, 4Internet is clearly a for-profit company that intends to generate
20   revenue. *See* Miller SSUF No. 11. Additionally, at the time the infringement
21   occurred in 2018, 4Internet was actively soliciting paid advertising on its platform.
22   Second Carreon Decl. ¶6.

23       Additionally, 4Internet's use of the Goat Photograph cannot be considered
24   "transformative" because 4Internet concededly does not claim to have altered the
25   Goat Photograph in any way. Miller SSUF No. 32. Nor does 4Internet's utilize the
26   Goat Photograph in a "new context." Indeed, the Goat Photograph is simply
27   reproduced over verbatim copied text from the original New York Post article. *See*
28   Miller SSUF Nos. 29, 32, and 34; see also *Otto v. Hearst Comms., Inc*., 345 F. Supp.

1  3d 412, 428 (S.D.N.Y. 2018) ("Stealing a copyrighted photograph to illustrate a
2  news article, without adding new understanding or meaning to the work, does not
3  transform its purpose—regardless of whether that photograph was created for
4  commercial or personal use.").

5      Finally, 4Internet's use of the Goat Photograph does not meaningfully affect
6  the functionality of its search technology. Unlike Google which produces a list of
7  thumbnail images as part of its Image Search functionality in order to assist users to
8  find relevant photographic search results, 4Internet's use of the Goat Photograph
9  was not in the context of an image search nor is it an integral part of its affinity type
10  targeted search functionality. *See* Miller SSUF No. 14. Indeed, the use of the Goat
11  Photograph seems wholly gratuitous which renders its usage less likely to be fair.

12      Thus, the first factor weight against fair use.

13  **B.**   **The Nature Of The Copyrighted Work Weighs Against Fair Use.**

14      The second factor considers "the nature of the copyrighted work." In so doing,
15  the court may consider, among other things, whether the work was creative,
16  imaginative, and original, . . . and whether it represented a substantial investment of
17  time and labor made in anticipation of financial return. *Pro Arts, Inc. v. Hustler*
18  *Magazine, Inc*. 787 F.2d 592 (6th Cir. 1986) (quotation omitted). Photographs are
19  generally viewed as creative, aesthetic expressions of a scene or image and have
20  long been the subject of copyright. *See* 17 U.S.C. § 102(a)(5) (extending copyright
21  protection to "pictorial, graphic, and sculptural works"). The Goat Photograph is
22  clearly subject to protectable copyright. *Ibid*.

23      Thus, the nature of the Images weighs against a finding of fair use.

24  **C.**   **The Substantiality Of The Portion Used Weighs Against Fair Use.**

25      The third fair use factor directs courts to examine the amount and
26  substantiality of the portion used in relation to the copyrighted work as a whole. *See*
27  *Sheldon v. Metro-Goldwyn Pictures Corp*., 471 U.S. 539, 565 (1985) ("no plagiarist
28  can excuse the wrong by showing how much of his work he did not pirate").

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    In the case at hand, 4Internet did not just use a portion of the Goat
2    Photograph, rather it used the entire work. In fact, 4Internet expressly stated that it
3    needed to use a full-size version of the Goat Photograph rather than a thumbnail
4    because thumbnail images were too small and too low quality for 4Internet's
5    purposes. Miller SSUF No. 33.

6    Since the 4Internet used the entirety of the Goat Photograph the third factor
7    weighs against the application of fair use.

8    **D.    The Effect On The Market Place Weighs Against Fair Use.**

9    Notably the four factor looks to the effect of the use upon the *potential* market
10   for or value of the copyrighted work. *Monge v. Maya Magazines, Inc.,* 688 F.3d
11   1164, 1181 (9th Cir. 2012) (Recognizing that fair use focuses on potential, not just
12   actual, market harm).

13   Here, Miller business depends on his ability to convince publications to pay a
14   licensing fee to use his photographs. Miller SSUF No. 9. Miller's arrangement with
15   the Post allows him opportunities to license his photographs to third parties. Miller
16   SSUF No. 7. However, unauthorized use of Miller's photographs has led to a rapid
17   decline in the number of paid licenses and impacts the overall value of his
18   photographs by diminishing exclusivity and causing Miller to have to devote
19   significant amounts of time and money to detecting and pursuing infringements.
20   Miller SSUF No. 10.

21   4Internet seems to think that it is exempt from licensing content because it
22   allegedly operates a "search engine." However, nobility of the user's purpose does
23   not widen the scope of fair use. *Sadowski v. BackChina* 2018 U.S. Dist. LEXIS
24   120875 at *4 (S.D. Tex. July 16, 2018). Indeed, the fact that 4Internet's use of the
25   Goat photograph was wholly gratuitous only exacerbates the problem further by
26   significantly increasing the potential for downstream infringement. As such, the
27   fourth factor weights against a finding of fair use.

28   In conclusion, the statutory factors weight heavily against a finding of fair use.

17

## VII.   4INTERNET IS NOT PROTECTED BY THE DMCA

The Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, established four safe harbors to provide protection from liability for copyright infringement. *Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc*., 853 F.3d 1020, 1027 (9th Cir. 2017). Section 512(a) provides safe harbor for service providers who act as conduits for infringing content. *Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 764-65 (9th Cir. 2007). As described the by the *CCBill* court:

> When an individual clicks on an Internet link, his computer sends a request for the information. The company receiving that request sends that request on to another computer, which sends it on to another. After a series of such transmissions, the request arrives at the computer that stores the information. The requested information is then returned in milliseconds, not necessarily along the same path. In passing the information along, each intervening computer makes a short-lived copy of the data. A short time later, the information is displayed on the user's computer.

> Those intervening computers provide transient connections among users. The Internet as we know it simply cannot exist if those intervening computers must block indirectly infringing content. We read § 512(a)'s grant of immunity exactly as it is written: Service providers are immune for transmitting all digital online communications, not just those that directly infringe.

*Perfect 10, Inc. v. CCBill* LLC, 481 F.3d 751, 765 (9th Cir. 2007)

Notably, 4Internet devotes its entire argument to the threshold question of whether it qualifies as a "service provider" but never explains how the 512(a) safe harbor applies to the technology at issue.

Here, it is not disputed that 4Internet did not actually make a copy of the Goat Photograph, but merely caused it to be displayed via an inline link from the Post's server. Miller SSUF No. 32. Thus, 17 U.S.C. § 512(a) which protects service providers from making potentially infringing "short-lived cop[ies] of the data" cannot apply to 4Internet who is not accused of transmitting any infringing data at all.

Furthermore, the basis of Miller's infringement claim has nothing to do with transmission of content as described by the *CCBill* court. Rather, it has to do with the display of the Goat Photograph on 4Jewish and 4RightWing. Thus, to the extent

18

1   any protected "transmitting" is at issue, it does not form the factual basis for Miller's

2   infringement claim. *See CCBill LLC*, 481 F.3d at 766 ("Even if the hyperlink

3   provided by CCBill could be viewed as an 'information location tool,' the majority of

4   CCBill's functions would remain outside of the safe harbor of § 512(d) . . . Perfect 10

5   does not claim that CCBill infringed its copyrights by providing a hyperlink; rather,

6   Perfect 10 alleges infringement through CCBill's performance of other business

7   services for these websites.").

8        Similarly, the section 512(b) safe harbor limits liability of service providers

9   who make "intermediate and temporary storage" of copyrighted material stored in a

10  cache. 17 U.S.C. § 512(b). Again, it is not disputed that 4Internet did not actually

11  make a copy of the Goat Photograph, but merely caused it to be displayed via an

12  inline link from the Post's server. Miller SSUF No. 32. Thus, because 512(b) applies

13  to caching, it cannot apply to 4Internet who is not accused of placing a copy of the

14  Goat Photograph into a cache.

15       Thus, 4Internet's Motion should be denied.

16  **VIII.  4INTERNET DID NOT HAVE AN EXPRESS OR IMPLIED LICENSE**

17       Next, 4Internet claims that it has a license to use the Goat Photograph.

18  4Internet does not specify whether it is claiming an express license or implied

19  license. However, as explained below, 4Internet cannot establish that it possesses

20  any form of license.

21       In its Motion, 4Internet claims to have an implied license from the New York

22  Post via its RSS Feed. The Ninth Circuit has held that an implied license has been

23  granted only when the following three elements are satisfied: "(1) a person (the

24  licensee) requests the creation of a work, (2) the creator (the licensor) makes that

25  particular work and delivers it to the licensee who requested it, and (3) the licensor

26  intends that the licensee-requestor copy and distribute his work." *Asset Marketing

27  Systems, Inc v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008).

28       Here, it is not disputed that 4Internet did not request the creation of the Goat

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Photograph. Miller SSUF Nos. 19-25. Thus, any implied license argument must fail.

Similarly, 4Internet's reliance on the New York Post's RSS feed is misplaced. As an initial matter, the mere fact that a copyrighted work is published on the Internet is not in and of itself sufficient to show that the author has provided an unrestricted implied license. *See e.g. Veeck v. S. Bldg. Code Cong. Int'l Inc*., 241 F.3d 398, 409 (5th Cir. 2001) (Observing that "countless entities provide free access to materials on the Internet and still retain enforcement of their copyrights."[quotation omitted]); *see also Thornton v. J Jargon Co*., 580 F. Supp. 2d 1261, 1281-82 (M.D. Fla. 2008) ("Defendants provide no authority for the proposition that the posting of the BBQE on Plaintiff's website granted an implied license to all [I]nternet users or that the work thereby entered the 'public domain.'"). Indeed, in order to exploit many of the exclusive rights of copyright, the copyright holder is required to disseminate the work publicly in some manner. *See* 17 U.S.C. § 106(3)(exclusive right to distribute); (4) (exclusive right to publicly perform); (5)(exclusive right to publicly display).

4Inernet's reliance on *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115–16 (D. Nev. 2006) is inapposite. In *Field*, a website owner sued Google for posting archived copies of the site's pages, which included copyrighted content. *Id.* at 1109-10. The "cached" pages at issue allowed users of the search engines to access an archival copy of a webpage stored in the search engine's system. The archival copy shows the page as it appeared the last time the search engine visited the page. *Id.* at 1111. This can be particularly useful when a page has been removed from its original location. *Ibid.* By adopting a "no-archive" meta-tag, the website owner could instruct the search engines not to provide a cached link to search engine users. *Id.* at 1112-13. The copyright owners in each of these decisions chose not to use the "no-archive" meta-tags, knew that the search engines would honor the meta-tags, and also knew the search engines would remove the cached copy upon request. In such circumstances, the courts found an implied license. *Id*. at 1116

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1      Unlike *Field* the instant case does not involve caching. While the New York
2  Post apparently allows the content of its RSS feed to be *indexed* by 4Internet that
3  does not necessarily means that content of the RSS feed can be freely used by
4  4Internet in any manner is chooses. Indeed, a page indexed by 4Internet remains
5  inaccessible to users until a query is performed at which time a web page is
6  generated based on specifications provided by 4Internet which tells the index which
7  information to use to populate the page and how to compile that information to
8  display through a user's browser. *See* Miller SSUF Nos. 15-18.

9      A court recently facing an identical issue of aggregating RSS feed content
10  observed that just because a publisher took affirmative steps to disseminate the full
11  text of its content through its RSS feed without any restrictions did not imply
12  permission to copy and publish that content on another website. *Midlevelu, Inc. v.*
13  *ACI Info. Grp.*, 989 F.3d 1205, 1217 (11th Cir. 2021).

14      Rather, the Post's terms of service which govern the use of its services,
15  including its RSS feed, explicitly prohibits the third party use of its content without
16  prior, written consent, which 4Internet concededly failed to obtain. Miller SSUF
17  Nos. 31, 35.

18      Thus, 4Internet cannot meet the requirements of an implied license.

19      Likewise, 4Internet cannot show that it had an express license from the New
20  York Post. 4Internet concededly never contacted the Post to obtain permission to use
21  any of the content from the Post's RSS Feed on 4Jewish or 4RightWing, including
22  the text and the Goat Photograph. Miller SSUF No. 35,

23      Thus, 4Internet's Motion should be denied.

24  **IX.    4INTERNET CONSTITUTIONAL CHALLENGE IS NONSENSICAL**

25      Finally, 4Internet's challenges the constitutionality of 17 U.S.C. §§ 102 and
26  410 as applied to photographs. 4Internet erroneously contends that there is a
27  "presumption" of copyrightability of photographs, but this is not so. Rather, like all
28  other copyrightable works, photographs must meet the minimum threshold of

originality. *See Feist Publ'ns, Inc*. 499 U.S. at 346 ("Originality is a constitutional requirement.)"

As 4Internet acknowledges, American copyright law has its origins directly in the text of the Constitution itself which specifically enumerates to Congress the broad apower "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8; *see also* 1 Patry on Copyright § 1:18 (setting forth the history of the copyright clause and its origins at the Constitutional Convention in 1787). Since its adoption, Congress has repeatedly chosen to exercise its Constitutional authority through copyright related legislation, the most recent of which is the Copyright Act of 1976. *See* 17 U.S.C. §§ 101 *et seq.* Under this broad Constitutional authority, Congress has specifically chosen to afford copyright protection to "pictorial works" 17 U.S.C. § 102(a)(5).

Because Congressional power to legislate on matters of copyright is rooted in the text of the Constitution itself, 4Internets argument would have this Court declare Article I, section 8, clause 8 to itself be unconstitutional. Since it would defy common sense to declare the Constitution itself unconstitutional, 4Internet's argument must fail.

Finally, previous constitutional challenges to copyright have been unsuccessful. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1985) (rejecting First Amendment challenge to copyright infringement action); *see also Zacchini v. Scripps-Howard*, 433 U.S. 562, 574-78 (1977).

Thus, 4Internet's Motion should be denied.

## X.    CONCLUSION

In conclusion, Plaintiff Robert Miller respectfully requests that Defendant 4Internet, LLC's summary judgment motion be denied.

1    DATED: November 22, 2021                    Respectfully submitted,

2

3                                               **/s/ Ryan E. Carreon**
                                                Ryan E. Carreon, Esq.
4                                               Cal. Bar No. 311668
                                                **HIGBEE & ASSOCIATES**
5                                               1504 Brookhollow Dr., Ste 112
                                                Santa Ana, CA 92705-5418
6                                               (714) 617-8336
                                                (714) 597-6559 facsimile
7                                               *Counsel for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**PROOF OF SERVICE**

I, the undersigned, say:


    I am a citizen of the United States, am over the age of 18 and not a party to the within action. My business address is 2445 Fire Mesa St., Suite 150, Las Vegas, NV 89128.


    On November 22, 2021 I caused to be served the foregoing documents:

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; SECOND DECLARATION OF RYAN E. CARRREON; SECOND DECLARATION OF EUGENE SADOWSKI; SEPARATE STATEMENT OF GENUINE DISPUTES; INDEX OF EXHIBITS AND EVIDENCE; OBJECTIONS TO EVIDENCE**

X    I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court, District of Nevada using the CM/ECF system which will send notice of such filing to the following registered CM/ECF users:

    Ryan Isenberg ryan@ihlaw.us


    I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on November 22, 2021 at Wilmington, Delaware.

                            */s/ Ryan E. Carreon*
                            Ryan E. Carreon