1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mathew K. Higbee, Esq., SBN 11158
Ryan E. Carreon, *pro hac vice*
**HIGBEE & ASSOCIATES**
3110 W Cheyenne Ave #200,
North Las Vegas, NV 89032
(714) 617-8373
(714) 597-6729 facsimile
Email: mhigbee@higbeeassociates.com
rcarreon@higbeeassociates.com

Attorney for Plaintiff,
ROBERT MILLER

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**LAS VEGAS DIVISION**

ROBERT MILLER,

              Plaintiff,

v.

4INTERNET, LLC; and DOES 1 through
10 inclusive,

              Defendants.

Case No. 2:18-cv-02097-JAD-VCF

**OPPOSITION TO 4INTERNET'S
MOTION FOR ATTORNEY'S FEES**

i

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In 2018, Plaintiff Robert Miller ("Miller") filed a simple case against Defendant 4Internet, LLC ("4Internet") asserting a single claim of copyright infringement arising out of a use of one of his photographs.

Defendant 4Internet, LLC ("4Internet") claims that Miller's Complaint was objectively unreasonable because it was barred by the "server test" articulated in *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ("*Perfect 10, I.*). 4Internet glosses over the fact that the applicability and breadth of the "server test" articulated in *Perfect 10, I,* had hardly been litigated at all in the Ninth Circuit prior to Miller's filing of this lawsuit on October 31, 2018. In fact, at that time multiple courts outside the Ninth Circuit opined that the "server test" was actually quite narrow. Indeed, shortly after Miller filed this case, a district court in the Ninth Circuit apparently agreed that the scope of the "sever test" was limited.

Rather, what was objectively unreasonable in this case was 4Internet's "scorched earth" litigation strategy. Instead of mounting a quick good faith defense against Miller's straight forward copyright claim, 4Internet elected to employ a prolonged and targeted campaign against Miller, his counsel ("H&A") as well as one of his colleagues.

As 4Internet freely admits, from the inception of this case, it always intended to mount an "inline link" defense to the infringement alleged here. In fact, 4Internet points to an Exhibit in Miller's own Complaint showing that the photograph at issue was inline linked. Dkt. #121, p. 4. To the extent, the 4Internet believed it would easily defeat Miller's claim on the basis of the "server test" it could have simply filed a 12(b)(6) motion to dismiss. Thus, instead of spending $100,000 and four years aggressively litigating this case, 4Internet would likely have only needed to spend a few thousand dollars and perhaps a few months on its defense.

1   Indeed, 4Internet, its owner, Michael Levy ("Levy") and its counsel apparently
2   relished in repeated opportunities to openly mock and defame Miller throughout this
3   litigation. In fact, while repeatedly accusing Miller of wrongdoing and aggressively
4   seeking discovery to that end, 4Internet mysteriously withdrew its "unclean hands"
5   defense on summary judgment conceding "that it has not obtained or developed the
6   evidence that would generally be required to support an unclean hands defense." Dkt.
7   #103, p. 18.

8   Thus, although 4Internet was ultimately successful in these proceedings[1],
9   Miller would submit that an award of attorneys' fees to 4Internet is not proper here.
10  Thus, 4Internet's Motion should be denied.

## II.    THE RELEVANT FACTORS WEIGH AGAINST A FEE AWARD

12  Awarding attorneys' fees pursuant to 17 U.S.C. § 505 is discretionary on the
13  part of the court. 17 U.S.C. § 505. In exercising its discretion to award fees to a
14  prevailing defendant, the district court is to consider several factors, including the
15  degree of success obtained, whether the purposes of the Copyright Act will be
16  furthered by a fee award, the parties' respective motivations, whether the legal
17  positions taken were frivolous or unreasonable, and the need for compensation and
18  deterrence. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, (1994) (non-exclusive
19  factors to consider include "frivolousness, motivation, objective unreasonableness . . .
20  and the need in particular circumstances to advance considerations of compensation
21  and deterrence"); *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S.Ct. 1979, 1989 (2016).

22  In this case, the relevant factors weigh against awarding attorneys' fees to
23  4Internet.

### A.   Miller's Claim Was Not Objectively Unreasonable.

25  When a court weighs whether to grant attorney's fees, a legal argument that
26  loses is not necessarily unreasonable. *See, e.g., VMG Salsoul, LLC v. Ciccone*, 824

---

[1] Miller intends to take this Court's admonition and "present [his] arguments to the Ninth Circuit" regarding the "server test" by way of an appeal. *See* Dkt. #117.

2

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

F.3d 871, 887 (9th Cir. 2016); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1181 (9th Cir. 2013).

4Internet states that Miller's claim was "egregiously objectively unreasonable" because of the applicability of Ninth Circuit "server test" to inline linked photographs. As an initial matter, it should be noted that the district court which originally announced the "server test," *Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006), explicitly stated that "adoption of the server test neither invites copyright infringing activity by a search engine such as Google nor flatly precludes liability for such activity." *Id.* at 843-44. In adopting the test, the district court expressly cautioned that application of the test was "susceptible to extreme or dubious results." *Id.* at 839.

At the time this case was filed, the applicability and breadth of the "server test" adopted by the Ninth Circuit had hardly been litigated at all rendering its applicability to the facts of Miller's case unclear. Between the announcement of the "server test" in 2007 and Miller's bringing of this lawsuit on October 31, 2018, only seven decisions in the Ninth Circuit had addressed the "server test" with two of those decisions coming in the same case as the appeal that resulted in the adoption of the "server test."

The two cases *Perfect 10, Inc. v. Google, Inc*., 2008 U.S. Dist. LEXIS 79200, at *1 (C.D. Cal. July 16, 2008) and *Perfect 10, Inc. v. Google, Inc*., 2010 U.S. Dist. LEXIS 145449, at *14 (C.D. Cal. July 30, 2010) were both part of the subsequent litigation of the original *Perfect 10, I* case. Both cases merely observed that *Perfect 10, I* had adopted the "server test" and added little to no additional insight regarding the applicability of the "server test" outside the specific facts of the case. The next case, *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc*., 2010 U.S. Dist. LEXIS 85266, at *12 (N.D. Cal. Mar. 19, 2010) again referenced the existence of the "server test" but held that the defendant in that case could not invoke it.

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

The next case *Perfect 10, Inc. v. Yandex N.V.*, 2013 U.S. Dist. LEXIS 65802, at *1 (N.D. Cal. May 7, 2013) also mentioned the "server test" in passing but resolved the pending motion on DMCA safe harbor grounds. Later in that same case, the court held that because the defendant's servers were located outside the United States, under the "server test" the infringements at issue were extraterritorial and therefore not actionable. *Perfect 10, Inc. v. Yandex N.V.*, 962 F. Supp. 2d 1146, 1154 (N.D. Cal. 2013). Citing the *Yandex* cases, the court in *Als Scan v. Cloudflare, Inc.*, 2017 U.S. Dist. LEXIS 234296, at *36 (C.D. Cal. June 1, 2017) also concluded that the infringements in that case were extraterritorial based on the "server test."

The final case to reference the "server test" prior to Miller's filing of the Complaint in this matter, mentioned that the "server test" was not applicable to the facts presented in that case. *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 2018 U.S. Dist. LEXIS 14147, at *17 (N.D. Cal. Jan. 29, 2018) (holding that "the 'server test' does not address the legal questions presented here, and nothing in the test alters the conclusion that Ubiquiti's Taiwanese servers may be relevant to Synopsys's DMCA claims.").

Thus, as far as Ninth Circuit cases were concerned, between the 2007 adoption of the "server test" in *Perfect 10, I*, and Miller's filing of the Complaint on October 31, 2018, the precise contours of the "server test" had sparsely been litigated.

In contrast, during that same time period, every court outside the Ninth Circuit to address the "server test" concluded that it should be narrowly construed based on the specific facts that were presented. The court in *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 590 (S.D.N.Y. 2018), which reached a decision nine months before Miller filed this case, provided a comprehensive synopsis of the state of *Perfect 10, 1* outside the Ninth Circuit:

> Defendants here argue that *Perfect 10* is part of an "unbroken line of authority" on which this Court should rely in determining broadly whether a copyright owner's display right has been violated. Outside of the Ninth Circuit, however, the Server Test has not been widely adopted. Even a quick survey reveals that the case law in this area is somewhat scattered. Of the

4

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

other Circuits, only the Seventh Circuit has weighed in thus far—in *Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012), the question before the court was whether the defendant was a contributory infringer. Defendant in that case, a "social bookmarker," whose service involved enabling individuals who share interests to point each other towards online materials (in this case, videos) that cater towards that taste, through embedding the code for the video onto its website. The videos remained hosted on the original servers. As with *Perfect 10*, upon arriving on defendant's website, thumbnails would appear; after clicking on one, the user would retrieve content from plaintiff's website. The *Flava* Court found that defendants were not contributory infringers; the question of direct infringement was never reached. The lower court, however, had opined that "[t]o the extent that *Perfect 10* can be read to stand for the proposition that inline linking can never cause a display of images or videos that would give rise to a claim of direct copyright infringement, we respectfully disagree. In our view, a website's servers need not actually store a copy of the work in order to 'display' it." *Flava Works, Inc. v. Gunter*, 2011 U.S. Dist. LEXIS 98451, 2011 WL 3876910, at *4 (N.D. Ill. Sept. 1, 2011), rev'd on other grounds, 689 F.3d 754 (7th Cir. 2012).

Four courts in this District have discussed the Server Test and *Perfect 10's* holding; none adopted the Server Test for the display right. First, in *Live Face On Web, LLC v. Biblio Holdings LLC*, 2016 U.S. Dist. LEXIS 124198, 2016 WL 4766344 (S.D.N.Y. Sept. 12, 2016), the issue before the court was the distribution right, not the display right. Defendant argued that a distribution had not occurred, since the alleged infringing content was hosted on a third-party server, and not its own. The court noted that defendant cited no legal authority for this proposition, but stated that "such authority may exist," citing *Perfect 10*. [cite.]. The court did not adopt the Server Test; rather, it held that additional discovery was necessary as the issue had "hardly" been briefed. [cite.] Second, in *MyPlayCity, Inc. v. Conduit Ltd.*, 2012 U.S. Dist. LEXIS 47313, 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012), the distribution right was again at issue. In that case, when the user clicked a "play now" button on the defendant's customized tool bar, it would be able to play games hosted on the plaintiff's servers. The court cited Perfect 10 and then found that, due to the fact that plaintiff's servers "'actually disseminated' the copies of [plaintiff's] copyrighted games, [defendant] cannot be held liable for infringing on [plaintiff's] distribution rights." [cite.] Third, in *Pearson Education, Inc. v. Ishayev*, 963 F. Supp. 2d 239 (S.D.N.Y. 2013), the court held that standard text hyperlinks (not including images) that users click in order to view and visit other sites were not a use of infringing content, relying in part on *Perfect 10*; the exclusive right at issue here, too, was the distribution right.

Only the fourth case in this District, *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) squarely dealt with the § 106(5) display right. There, however, the court did no more than offer a simple factual statement, "The Ninth Circuit has held that the display of a photographic image on a computer may implicate the display right, though infringement hinges, in part, on where the image was hosted." *Id.* at 652 (emphasis added). It then proceeded to deny summary judgment based on material disputes as to the content of the allegedly infringing issues. *Id.*

Additionally, in a trademark decision rendered in this District prior to *Perfect 10*, when considering whether defendant Tunes was liable for trademark infringement to the Hard Rock Café for "framing" the Hard Rock logo on their website, the court held that it was. *Hard Rock Cafe Int'l (USA)*

5

*Inc. v. Morton*, 1999 U.S. Dist. LEXIS 8340, 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999). After considering both the fact that "it [was] not clear to the computer user that she or he has left the [plaintiff's] web site" and the fact that there was a "seamless presentation" on the website, the court found that "the only possible conclusion is that the Hard Rock Hotel Mark is used or exploited to advertise and sell CDS." [cite.]

Only a handful of other district courts have considered the issue. In *Grady v. Iacullo*, 2016 U.S. Dist. LEXIS 51584, 2016 WL 1559134 (D. Colo. Apr. 18, 2016), the court considered the exclusive reproduction and distribution rights, and, relying on *Perfect 10*, reopened discovery in order to allow plaintiff an opportunity to show that defendant stored the allegedly infringing images on his own computer. In another recent district court case, plaintiff survived the motion to dismiss stage in a distribution case, based on the theory that each time a user used defendant's website, it "cause[d] a copy of [plaintiff's] software to be" distributed to the website visitor's computer in cache, memory, or hard drive" and that the "[defendant's] website distributed copies of the code to each of the website's visitors." *Live Face on Web, LLC v. Smart Move Search, Inc*., 2017 U.S. Dist. LEXIS 40247, 2017 WL 1064664 (D.N.J. Mar. 21, 2017), at *2.

Finally, in *The Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017), at issue on summary judgment was, *inter alia*, whether plaintiffs infringed defendant's exclusive display rights by "framing" defendant's websites. The court rejected *Perfect 10*, holding that by "framing the defendant's copyrighted works, the plaintiffs impermissibly displayed the works to the public." [cite.] It distinguished *Perfect 10* on its facts, noting that, "[U]nlike Google, [plaintiffs' website] did not merely provide a link by which users could access [defendant's] content but instead displayed [defendant's] content as if it were its own." [cite.] It further stated: "[T]o the extent *Perfect 10* makes actual possession of a copy a necessary condition to violating a copyright owner's exclusive right to display the copyrighted works, the Court respectfully disagrees with the Ninth Circuit. . . . The text of the Copyright Act does not make actual possession of a work a prerequisite for infringement." *Id.*

In sum, this Court is aware of only three decisions outside of the Ninth Circuit considering the display right in light of *Perfect 10*; one from the Seventh Circuit which adopted the Server Test for contributory liability, one from the Southern District which stated as a factual matter only that *Perfect 10* existed, and one from the Northern District of Texas rejecting *Perfect 10*.

…

[T]o the degree that defendants interpret *Perfect 10* as standing for a broadly-construed Server Test, focusing on the physical location of allegedly infringing images, this Court disagrees. Rather, *Perfect 10* was heavily informed by two factors—the fact that the defendant operated a search engine, and the fact that the user made an active choice to click on an image before it was displayed—that suggest that such a broad reading is neither appropriate nor desirable.

In *Perfect 10*, the district court's Opinion, while not strictly cabining its adoption of the Server Test to a search engine like Google, nevertheless relied heavily on that fact in its analysis. It stated, for example, that adopting the Server Test "will merely preclude <u>search engines</u> from being held directly liable for in-line linking and or framing infringing contents stored on third-

party websites." [cite] (emphasis added). It went on: "<u>Merely to index the web so that users can more readily find the information they seek</u> should not constitute direct infringement . . . ." [cite.] (emphasis added). On appeal, the Ninth Circuit began its statement of the case by saying, "we consider a copyright owner's efforts to stop an <u>Internet search engine</u> from facilitating access to infringing images." [cite.]

In addition, the role of the user was paramount in the *Perfect 10* case— the district court found that users who view the full-size images "after clicking on one of the thumbnails" are "engaged in a direct connection with third-party websites, which are themselves responsible for transferring content." [cite."]

In this Court's view, these distinctions are critical. In *Perfect 10*, Google's search engine provided a service whereby the user navigated from webpage to webpage, with Google's assistance. This is manifestly not the same as opening up a favorite blog or website to find a full color image awaiting the user, whether he or she asked for it, looked for it, clicked on it, or not. Both the nature of Google Search Engine, as compared to the defendant websites, and the volitional act taken by users of the services, provide a sharp contrast to the facts at hand.

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 590-96 (S.D.N.Y. 2018).

Thus, the weight of authority in cases outside the Ninth Circuit directly addressing the practice of "inline linking" in relation to the "server test" combined with the complete dearth of Ninth Circuit authority interpreting the same, left the precise contours of the "server test" unsettled law.

Shortly after Miller filed this case, a district court in the Ninth Circuit directly stated that the "server test" was likely in applicable outside the context of search engines. *See Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019) ("FSS cites no case applying the *Perfect 10* server test outside of the context of search engines. Indeed, subsequent cases have refused to apply the *Perfect 10* server test outside of that context."). Indeed, when addressing *Perfect 10, I* the Ninth Circuit itself later opined "the label 'search engine' is not a talismanic term that serves as an on-off switch" rather a court must be cognizant of "the importance of considering the details and function of a website's operation" in making determinations[2]. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 742 (9th Cir. 2019).

_____

[2] Miller is aware that 4Internet considers itself a "search engine." However, as explained Section IV.A  of his summary judgment opposition "4Internet's use of the Goat Photograph was not in the

Finally, 4Internet points to a pre litigation email from Miller's counsel mistakenly asserting his belief that the photograph was not inline linked. However, 4Internet completely skips over the second paragraph in the email in which counsel stated, "this case is completely different than in the Perfect 10 case, which involved a search engine [and] low resolution images that were part of a user generated search index, which is completely different than results compiled by a news aggregator." Thus, as explicitly explained in the email, Miller's counsel believed this case to be distinguishable from *Perfect 10, I* regardless of whether the photograph was inline linked or not.

While Miller respect's the Court's decision to consider the "server test" both factually applicable and binding, the authorities cited above make it clear that Miller's infringement claim was not objectively unreasonable considering the confusion surrounding the scope and breadth of the "server test."

Thus, the "unreasonableness" factor does not weigh in favor of a fee award and 4Internet's Motion should be denied.

**B.   The Degree of Success Obtained Is Mitigated By 4Internet's Counterclaim Dismissal And Belated Litigation Of Inline Linking.**

4Internet's single sentence addressing this factor states that "[t]he Court granted 4Internet's Motion for Summary Judgment in full and on the merits." While, Miller does not dispute that 4Internet ultimately prevailed on the copyright infringement claim, 4Internet fails to acknowledge that it succeeded in delaying these proceedings for nearly a year and a half by asserting and then reasserting frivolous counterclaims against Miller, H&A[3], and photographer Christopher Sadowski that were ultimately dismissed. *See* Dkt. #47.

---

context of an image search nor [was] it an integral part of its affinity type targeted search functionality."

[3] The frivolous nature of 4Internet's Counterclaims are discussed more fully in H&A's recently filed Motion for Attorneys' Fees at Dkt. #123.

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

In addition to having its Counterclaims dismissed, Miller succeeded in having half of 4Internet's affirmative defenses stricken as improper (Dkt. #23) and had its Motion for Sanctions denied (Dkt. #111). Furthermore, on summary judgment, 4Internet conceded its affirmative defenses for "unclean hands" and "express license" were without merit and unsupported by the factual record. Dkt. #103, pp. 18-19. A significant amount of the litigation was devoted to discovery disputed related to 4Internet's "unclean hands" defense including motions to quash subpoenas[4] (Dkt. #60) as well as a motion to compel Miller to provide his tax returns, litigation settlements, and demand letters (Dkt. #68[5], 79).

Finally, as to the ultimately dispositive issue, as 4Internet freely admits, from the inception of this case, it always intended to mount an "inline link" defense to the infringement alleged here. In fact, 4Internet points to an Exhibit in Miller's own Complaint showing that the photograph at issue was inline linked. Dkt. #121, p. 4. To the extent, the 4Internet believed it would easily defeat Miller's claim on the basis of the "server test" it could have simply filed a 12(b)(6) motion to dismiss early in the case or immediately moved for summary judgment[6]. However, 4Internet inexplicably delayed in raising that issue to the Court.

---

[4] In its opposition to Miller's motion to quash two subpoenas issued to the New York Post, 4Internet justified the subpoenas by arguing that "Defendant has asserted that there is a seeding operation involving changes to the underlying image meta data that serves only the purpose of making the images more visible to create new targets" (Dkt. #60, p.6), and "[a]s demonstrated by the attachment to the subpoena, the New York Post posted an article online with a stock image [and s]omeone then went in and substituted an image credited to the Plaintiff in its place. There can't be any financial reason the New York Post would pay Plaintiff for a second image for such a small and minimally newsworthy article. Defendant seeks to understand why this was done and who benefits from it and whether it was done in furtherance of the Plaintiff's real job, which is to generate copyright infringement claims" (Dkt. #60. p. 7).

[5] In its Motion to Compel, 4Internet justified its need for the discovery because "Plaintiff, and his counsel, are copyright trolls who nominally used copyright law as a source of revenue generation. … a scheme that by all appearances is nothing less than legalized extortion." Dkt. 68-1, p. 4.

[6] Miller anticipates that 4Internet may argue that it did not want to waste its ability to bring a summary judgment motion until the full factual record was developed. However, 4Internet could have easily raised the issue to the Court early in the case and suggested targeted briefing on the

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

Although 4Internet ultimately prevailed by invoking the "server test" on summary judgment, a view of the full record shows that 4Internet's path to success was dawdling and inconsistent. Thus, the "degree of success" factor does not weigh in favor of a fee award and 4Internet's Motion should be denied.

## C.   4Internet's Own Words Demonstrate Its Bad Faith Motivation.

Although motivation is one of the factors to be considered in awarding attorneys' fees, 4Internet's Motion does not directly address Miller's motivation for filing this lawsuit. This is likely because Miller has done nothing except pursue his straightforward copyright claim in good faith to seek reasonable renumeration for what has become a rampant problem of serial copyright infringement on the Internet. *See Ward v. Consequence Holdings, Inc.*, 2020 U.S. Dist. LEXIS 80499, at *8 (S.D. Ill. May 7, 2020) ("Misuse of intellectual property has become a pervasive problem in the internet era and one that is especially pernicious for freelance photographers … who often lack the resources to pursue claims in court … knowing that even if successful they may receive mere token payments of a few hundred dollars for their work, far less than their legal fees.").

Indeed, 4Internet concedes in its Motion that the amount in controversy was always minimal and likely could have been negotiated down further despite the time, costs, and attorneys' fees invested in pursuing litigation. Dkt. #121-3, p. 7 (noting that Miller's initial[7] settlement demand to 4Internet was for $6,750).

In contrast, 4Internet's motivation in aggressively defending this case is abundantly clear. A significant portion of 4Internet's filings, evidence, and testimony in this case were devoted to irrelevant *ad hominem* attacks in what is clearly a thinly

inline link issue to preserve resources with the understanding that if 4Internet lost the motion, the parties would then proceed to full discovery on the remaining merits.

[7] In its Answer 4Internet stated that it refused to negotiate a settlement. *See* Dkt. #29, ¶20. While Miller recognizes that 4Internet was not obligated to negotiate a settlement, Miller would submit that the low dollar figure sought compared with 4Internet's unwillingness to try and resolve the matter informally further demonstrates the unreasonable nature of 4Internet's ultra-aggressive litigation strategy.

10

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

veiled attempt to use the judicial process harass and embarrass Miller and his counsel. Indeed, 4Internet's owner, Michael Levy, essentially admitted as much in his deposition:

> **Mr. Levy:** I want to point out what's going on here. I just feel like I've got a duty. I'm -- A, obviously I don't like being sued, all right, and I want to win this lawsuit. But I feel like I've got a duty to point out this is going on. That this is ridiculous.
> …
> This is silly. This is burning up the court's time. You know -- sorry, I got to stand. Somebody needed to step in and point it all out. And I'm qualified to do it. I understand technology real well. I understand all these issues.
> …
> **Mr. Carreon:** And what leads you to believe that it's extortion?
>
> **Mr. Levy:** I think everybody can see what's going on here. I think everybody can see who Mr. Miller is. We're going to depose the Sadowskis. I think we know. I think the courts have found out. … [You] guys are a bunch of trolls. I mean, you just file nuisance lawsuits and strong-arming people, because you know how complex the copyright law is. And most people won't stand up. Most people can't stand up. But I will. I can and I will. I don't have a choice. I have to. I mean, I can't allow this to go on.
> …
> I urge you to this stop this. There's one lawyer that's already been suspended from practicing law. And I don't know, he may go to jail. You know, you certainly don't want to be the next one. Mr. Higbee doesn't want to be the next one. Okay? So this is ridiculous. It's time to stop it. It's egregious.

Declaration of Ryan E. Carreon, ¶¶ 2-3, Exhibit A at pp. 240- 245.

In addition to his deposition testimony, Levy also prepared an "expert report" that he submitted with 4Internet's summary judgment motion which contained an "analysis" of Miller's alleged intent in bringing this lawsuit some of which is excerpted below:

> The other parties in this case appear to me to be an organization of people and entities. They include Robert Miller (a photographer with the New York Post,) Christopher Sadowski (a photographer with the New York Post who claims to be the agent of Robert Miller,) Eugene Sadowski (an agent of Christopher Sadowski,) and Attorneys Matthew Higbee and Richard Liebowitz.
> …
> I believe the description "copyright trolls" is fair. However, for purposes of this report, I will benevolently refer to them as simply Higbee-Liebowitz clients because that appears to be the same things as "copyright trolls."
> …
> [I]t is my opinion that the Higbee- Liebowitz clients' intent is to make these photographs as easy to distribute as possible and to distribute them as widely as possible with the intent of generating claims of infringements.

11

…

The Higbee-Liebowitz clients have abused the use of meta information by tricking the search engines into spreading their photographs as public images, then suing and extorting people who properly use the internet standards that have been put in place. It is a travesty.

…

I believe the Higbee-Liebowitz clients are deliberately entering information in a format they know will not be automatically recognized by the search engines and distribution networks as copyrighted at the time those services ingest the photos into their systems.

…

The goal of the Higbee-Liebowitz clients was to generate claims of infringement.

…

To trick the automated systems of the search engines, social networks, and distribution systems into spreading the photographs, they fraudulently misrepresented the copyright in both the meta information of the photographs (EXIF data) and the web page meta data that displayed them."

*See* Dkt. 94-19.

As an exclamation to his "findings" the final sentence of Levy's report reads "They are Higbee-Liebowitz clients, they are copyright trolls." *Ibid.*

4Internet's filings are also saturated with heavy and outlandish accusations. A non-exhaustive list of the defamatory and irrelevant accusations levied in this action are listed below:

- Stating that H&A had "conspired" with Miller and Sadowski to "engage[] in []unlawful acts" for the purpose of "manufacturing the instant action" (Dkt. #9, ¶ 13; Dkt. #40, ¶ 6);

- Stating that Miller "manipulate[s] the metadata in [his] digital photographs" (Dkt. #9, ¶ 23);

- Stating that 4Internet has "uncontroverted evidence that photo credits have been changed on the New York Post website after publication and that [Miller has] asserted ownership claims for images that were previously in the public domain or orphaned;" (Dkt. #9, ¶ 24, fn. 1);

- Stating that H&A "have staff who use consumer debt collection tactics to call and harass potential defendants for the purpose of extorting money from parties who may or may not have infringed on a photograph" (Dkt. #9, ¶ 28);

- Stating that H&A's "business model involves getting settlements from defendants in amounts that are not worth defending and obtaining default judgments against parties who do not respond" (Dkt. #9, ¶ 36; Dkt. #40, ¶ 100);

12

- Stating that Miller is a "copyright troll" (Dkt. #9, ¶ 37);

- Stating that Miller engages in "legalized extortion" (Dkt. #9, ¶ 38);

- Implying that Miller's counsel, Mathew Higbee, perjured himself in his declaration (Dkt. #40, ¶¶ 66-67);

- Stating that "[t]his case is about an extortionate scheme carried out under the guise of copyright law by Plaintiff, his 'agent,' and their lawyers, Richard Leibowitz[8] and Mathew Higbee, among others." (Dkt. #60, p. 2);

- Stating that "Defendant has asserted that there is a seeding operation involving changes to the underlying image meta data that serves only the purpose of making the images more visible to create new targets to feed the Higbee/Leibowitz machine" (Dkt. #60 p. 6, citing Dkt. #29, pp. 7, 8);

- Stating that someone switched out an image on the New York Post website "in furtherance of the Plaintiff's real job, which is to generate copyright infringement claims" (Dkt. #60. p. 7);

- Stating that "Plaintiff, and his counsel, are copyright trolls who nominally used copyright law as a source of revenue generation. … a scheme that by all appearances is nothing less than legalized extortion" (Dkt. 68-1, p. 4);

- Stating that the litigation presents "many questions that need to be answered. Is this case lawyer or client driven? What really is the size and scope of the enterprise? How much of any statutory damage award will go to the Plaintiff, and how much will go his 'agent' and his attorney? What is really going on and how is it that every case filed by the Plaintiff was first and only published in the New York Post online edition?" (Dkt. 68-1, p. 6);

- Stating that "given Plaintiff's association with Richard Leibowitz, Defendant is skeptical at best that any document produced is in fact legitimate and everything is subject to proper secondary scrutiny" (Dkt. 68-1 p. 11);

- Mockingly referring plaintiff's legal strategy as "Look at me, I am an accomplished professional photographer" (Dkt. 70 pp.1-2);

- Stating that this case is part of the "extortive scheme of Messrs. Higbee and Liebowitz" (Dkt. 70, p. 4);

- Stating that that Miller's good faith discovery objections are merely a pretext to "prevent Defendant from having the information to convince the Court that it should put the Plaintiff and his agent, [sic] out of the litigation business" (Dkt. 70, p. 4);

---

[8] Throughout the litigation 4Internet repeatedly sought to invoke the name of disgraced attorney Richard Liebowitz when discussing H&A despite the fact that H&A has never worked with Liebowitz in any capacity and consider him to be a direct competitor whose unethical tactics have cast a dark cloud over the ability of freelance artists to pursue legitimate copyright claims.

13

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

- Stating that that Miller's objected to a broad request for all communications with Sadowski because "Plaintiff doesn't want to produce communications that talk about the size and scope of their real business or how their photographs have no actual value, how stationary video cameras could capture most of what they get published, or their understanding that the New York Post publishes their pictures on Twitter which results in a license;" (Dkt. 70, p. 5);

- Mockingly stating "For the first time, Plaintiff put his lawsuit in the ATM machine and no money came out" (Dkt. 70, p. 5);

- Stating that Miller "abuses this system" (Dkt. 70, p. 5);

- Stating that "Considering Mr. Miller and his agent Mr. Sadowski are also regularly represented by the notoriously truth challenged lawyer Richard Liebowitz, the Plaintiff does not come into court with the same sort of baseline credibility that might ordinarily allow counsel to take a party's or his lawyer's words at face value or better" (Dkt. 74, p. 3 fn 2);

- Implying that Miller operated under a false identity and stating that "Defense counsel should be able to ask Mr. Miller to pull out his license at his deposition and verify his identity" (Dkt. 70, p. 4);

- Mockingly stating "Plaintiff's real arguments are that he doesn't want to bothered having to litigate and prove his claims and allow Defendant the opportunity to develop and present its defenses. He just doesn't understand why this case hasn't settled as his cases are supposed to just be easy money" (Dkt. 80, p. 2);

- Mockingly stating that "Plaintiff's position is actually that he is allowed to let the jury know that he is this big-time photographer who has been published in Time or whatever he says without any proof" (Dkt. 80, p. 4);

- Stating that "Plaintiff is not even being truthful with the Court about [his] alleged licenses" (Dkt. 80, p. 4);

- Stating that "Plaintiff and his attorneys are engaged in a high-volume copyright trolling organization. Giving them the benefit of the doubt, they are a hammer and everything they see is a nail" (Dkt. 98, p. 7); and

- Stating that "The nature of the [deposition] objections suggest that what Plaintiff's counsel was concerned with was not any legitimate privilege issue, but interfering with Defendant's effort to inquire as to the amount of money that has been generated as a result of the business model employed by Plaintiff and others – most assuredly and notably his lawyer" (Dkt. 98, p. 11).

In sum, it is quite clear that 4Internet's motivation went far beyond simply litigating a defense in good faith. Rather, it is abundantly clear that 4Internet used practically every opportunity it could to advance its fringe theories to "expose" Miller and his counsel.

4Internet's extreme lack of civility[9] should not be rewarded here. Thus, 4Internet's Motion should be denied.

### D.   4Internet's Mischaracterizes Miller's Alleged "Misbehavior."

Continuing its assault, 4Internet contends that Miller and H&A engaged in alleged "misbehavior." Most of 4Internet's arguments are a rehash of its previously unsuccessful motion for sanctions which was denied[10]. In the instant Motion, 4Internet makes vague assertions of spoliation, manufactured evidence, and bad-faith objections without providing any specific details for the Court to consider. As such, Miller will not relitigated the merits of 4Internet's sanctions motions here. A full explanation of Miller's position on these accusations can be found in his Opposition brief filed at Dkt. #100.

### E.   Policies of Compensation And Deterrence Would Not Be Advanced By A Fee Award Against Miller.

As expected, 4Internet's primary argument in favor of the "compensation and deterrence" factor is simply a rehash of its many *ad hominem* attacks against Miller and his counsel. 4Internet invokes the tired "copyright troll[11]" label and 4Internet predictably points out that Miller's *counsel* has filed hundreds of copyright infringement lawsuits. 4Internet argues that a fee award would deter Miller from bringing suits that he knows lack merit or encourage him to conduct sufficient diligence to avoid bringing allegedly frivolous claims in the future.

---

[9] Local Rule 1-1(c) states "The court expects a high degree of professionalism and civility from attorneys."

[10] It should be noted that 4Internet filed its Motion for Sanctions one month after the stipulated October 4, 2021 discovery cutoff date had expired despite the alleged discovery issues arising prior to the cutoff date and then argued that because discovery was closed, the only appropriate resolution was terminating sanctions against Miller. Furthermore, 4Internet timed its filing to occur two days after the parties' cross motions for summary judgment so that Miller's opposition would be due at nearly the same time as his summary judgment opposition.

[11] For a broader discussion of the definition of "copyright troll" and why that label does not apply to Miller or H&A, Miller would direct the Court to Dkt. #123, page 10, footnote 4.

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

As stated above in section II.A, Miller's position was hardly frivolous given the uncertain state of the "server test" at the time this lawsuit was filed. Nor does 4Internet explain why the filing volume of H&A, a law firm whose business is to file litigation cases on behalf of its many clients, has any bearing on why Miller should bear a fee award. In fact, in its Answer, 4Internet noted that H&A had filed a grand total of three litigation cases on Miller's behalf in the previous three years. Dkt. #9, ¶34.

Regardless, filing volume alone is not an indication of an abuse of the court system. See *Live Faceon Web. LLC v. Cremation Soc'y of Ill., Inc.*, 2022 U.S. Dist. LEXIS 48439, at *11 (N.D. Ill. Mar. 18, 2022) ("Overall, although Plaintiff filed many copyright claims across the country, that alone does not make it a 'copyright troll' or warrant a fee award in this case to deter its general litigation tactics."); *Oppenheimer v. Scarafile*, 2022 U.S. Dist. LEXIS 123782, at *9 (D.S.C. July 12, 2022) ("Standing alone, initiating multiple copyright infringement actions and attempting to negotiate settlements does not indicate copyright misuse or copyright trolling." [collecting cases]).

4Internet has not pointed to a single other case brought by Miller or H&A that was frivolous or even resulted in a loss on the merits. And even if it could, it would be unreasonable to expect a law firm or litigant to win 100% of its cases. Simply put, 4Internet's argument that Miller's general litigation tactics ought to be deterred by a windfall of fees awarded to 4Internet lacks any discernible basis.

4Internet also argues that a fee award would deter Miller from allegedly leveraging litigation to claim license fees for photographs of no real value. 4Internet's self-serving assessment of the "value" of Miller's photographs notwithstanding, there is nothing untoward about Miller expecting to be compensated for the unauthorized use of his work. The Supreme Court has noted that Congress enacted a statutory damages regime in copyright law so that a copyright holder may still be compensated "[e]ven for uninjurious and unprofitable invasions of

copyright." *F.W. Woolworth Co. v. Contemporary Arts*, *Inc*., 344 U.S. 228, 233 (1952); *see also New Form, Inc. v. Tekila Films, Inc*., 357 F. App'x 10, 11-12 (9th Cir. 2009) ("There is no required nexus between actual and statutory damages.").

Indeed, 4Internet itself noted that Miller's initial settlement demand to 4Internet was for the modest amount of $6,750. *See* Dkt. #121-3, p. 7. Considering the filing fees and attorneys' fees associated with litigation in combination with the fact that Millers *initial* settlement demand was likely to be further negotiated downward, it is clear that Miller is not engaged in overinflating the value of his cases.

Finally, 4Internet attempts to bootstrap an innocuous deposition objection and power of attorney document into evidence of nefarious wrongdoing.

As to the deposition objection, 4Internet's counsel asked Miller whether H&A settled cases on Miller's behalf without his knowledge. Miller's counsel replied "I'm going to caution the witness to not reveal any attorney/ client communication. So *if you can answer the question without discussing any communications that you had with Higbee & Associates, you can answer it.* If you can't, then I will instruct you not to answer." Miller replied, "I can't" and chose not to answer the questions. Setting aside the dubious nature of the question to begin with, Miller's counsel specifically instructed Miller to answer the question if he could without disclosing privileged information. Miller decided that he could not and chose not to answer.

As to the power of attorney document, 4Internet's argument is hard to follow. As is common in litigation, Miller executed a power of attorney document giving H&A authority to negotiate copyright infringement cases on his behalf. Nothing in the document purports to give H&A authority to settle a case without Miller's knowledge or consent[12]. Indeed, such conduct would likely be in violation of multiple rules of professional conduct.

---

[12] Even if 4Internet's assertion were true, 4Internet's own argument is contradicted by the fact that Miller would still be required to sign settlement agreements for any resolved claims, thus having full knowledge of any settlement prior to signing and the ability to refuse to sign if he so chose.

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

Thus, the considerations of compensation and deterrence do not weigh in favor of a fee award and 4Internet's Motion should be denied.

### F.    The Purpose Of The Copyright Act Would Not Be Furthered By A Fee Award In Favor Of 4Internet.

Under the Copyright Act, the question is whether a successful *defense* of the action furthered the purposes of the Act, not whether a fee award would do so. *See Fogerty*, 510 U.S. at 527. The primary objective of copyright is "'to promote the Progress of Science and useful Arts.' To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Feist Publications, Inc. v. Rural Telephone Service Co*., 499 U.S. 340, 349-350 (1991).

In this case, awarding fees to 4Internet would not further the purposes of the Copyright Act. While Miller respects that the Court felt bound by *stare decisis* to apply the "server test" it must be noted that the "server test" primarily turns on invisible, technical processes imperceptible to a website visitor. *See American Broadcasting Cos., Inc. v. Aereo, Inc.,* 134 S. Ct. 2507 (2014) ("This [technical] difference means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system that is for all practical purposes a traditional cable system into a 'copy shop that provides patrons with a library card.'").

In other words, the "server test" allows an entity such as 4Internet to reap all the benefits of what appears to a viewer to be infringing conduct, while effectively evading liability by employing a single line of code. *See Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) (expressly cautioning that application of the "server test" was "susceptible to extreme or dubious results."). Perhaps that is an argument better suited for appeal. Nonetheless, considering that virtually no case[13] in

---

[13] As Miller previously noted, the first case to directly challenge the "server test" appears to be *Hunley et al v. Instagram, LLC et al.* case 22-15293 filed in the Ninth Circuit on March 1, 2022. Notably, the *Hunley* case was resolved on a 12(b)(6) motion, which supports Miller's argument

18

the Ninth Circuit has directly confronted the "server test" since it was first announced nearly 15 years ago, it would seem unfitting for the Court to conclude that a successful defense of this action based on the "server test" furthers the purposes of the Copyright Act.

Thus, 4Internet's Motion should be denied.

## III.    THE FEES SOUGHT ARE UNREASONABLE AND EXCESSIVE

Finally, if the Court is inclined to award fees, it should not award the over $110,000 sought by 4Internet.

4Internet mentioned that it expended "significant amounts of time dealing with motions to strike defenses, handing to file motions to compel and spoliation sanctions [sic]." However, as explained previously Miller succeeded in striking half of 4Internet's defenses, 4Internet ultimately abandoned the arguments that formed the basis of its motion to compel and had its spoliation motion summarily denied. Any fees awarded should be significantly reduced to account for this.

Furthermore, 4Internet's counsel states that, of the 400 hours allegedly spent litigating the case only 4.5 hours were incurred by staff and a lowly 2.5 hours were incurred by associates. This does not suggest that 4Internet made any attempt to mitigate its fee bill by delegating tasks to associates or staff. 4Internet suggests that this time was necessary because its counsel is "more thorough than other lawyers." However, Miller should not be forced to bear the expense of an unnecessarily padded bill when many of the task could have been completed by staff or attorneys billing at a lower rate.

4Internet has also failed to present evidence that it actually was made to pay the amount sought in its Motion.

Finally, as explained above, Miller submits that 4Internet should have raised the "server test" defense at the motion to dismiss stage or early in the case through

---

that 4Internet's aggressive and protracted litigation of this case was unnecessary when the dispositive issue could have been immediately raised.

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

targeted briefing. Had it done so, the vast majority of the litigation would have been unnecessary, If the Court is inclined to award fees, Miller would request that the Court consider awarding fees in an amount that it would deem reasonable had the issues been raised on a motion to dismiss.

## IV.    CONCLUSION

In conclusion, Robert Miller respectfully requests that 4Internet's Motion for Attorneys' Fees be denied.

Dated: July 25, 2022                                    Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
*Pro Hac Vice*
**HIGBEE & ASSOCIATES**
3110 W Cheyenne Ave #200,
North Las Vegas, NV 89032
(714) 617-8373
(714) 597-6559 facsimile
rcarreon@higbeeassociates.com

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**

**PROOF OF SERVICE**

I, the undersigned, say:


I am a citizen of the United States, am over the age of 18 and not a party to the within action. My business address is 3110 W Cheyenne Ave #200, North Las Vegas, NV 89032.

On July 25, 2022 I caused to be served the foregoing documents:


**OPPOSITION TO MOTION FOR ATTORNEYS' FEES; DECLARATION OF RYAN E. CARRREON;**

X     I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court, District of Nevada using the CM/ECF system which will send notice of such filing to the following registered CM/ECF users:

Ryan Isenberg ryan@ihlaw.us

Troy L. Isaacson     Troy@IsaacsonLawLV.com


I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on July 25, 2022 at Wilmington, Delaware.

*/s/ Ryan E. Carreon*
Ryan E. Carreon

**OPOSITION TO MOTION FOR ATTORNEY'S FEES**